IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JOHN DOE, A MINOR,<br>THROUGH HIS PARENT<br>AND GUARDIAN,<br>MARY DOE. | ) ) ) ) ) ) | |
| PLAINTIFF. | ) ) | |
| VS. | ) ) ) | No. 1:24-CV-00349<br>JUDGE McDONOUGH<br>JURY DEMANDED |
| MARION COUNTY, TENNESSEE;<br>MARION COUNTY SCHOOL DISTRICT | ) ) ) | |
| DEFENDANT(S). | ) | |

# FIRST AMENDED COMPLAINT

**COMES THE PLAINTIFF, JOHN DOE**, through his parent, Mary Doe, and counsel, submitting this First Amended Complaint and showing:

## I.    PARTIES, JURISDICTION, AND VENUE

1.    The Plaintiff is John Doe who is a citizen and resident of Marion County, Tennessee, where he attends public school.  His case is brought through his natural parent, Mary Doe.

2.    The Defendants, Marion County, Tennessee, and its school district, the Marion County School District, are a county government, and the public school district for said Marion County, each organized under the laws of the State of Tennessee.  They receive federal funds.

3.      This action arises from Section 1983 and the First Amendment to the United States Constitution along with the Fourteenth Amendment to the United States Constitution. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

4.      Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Marion County and the Defendant may be found in Marion County.

## II.      FACTS

*Tennessee's Mass Violence Law and "Valid" Threats*

5.      In 2021, Tennessee made it a misdemeanor to threaten "Mass Violence on School Property."[1] A threat of "mass violence" is not any old threat. It is an act which "a reasonable person would conclude could lead to the serious bodily injury…or the death of two or more persons."[2] Last year, 2024, the legislature elevated the crime to a felony.

6.      Intentions matter. The speaker must "recklessly" threaten mass violence.[8] A student is "reckless" if they are aware of "a substantial and unjustifiable risk" that others may perceive their speech as a threat of mass violence, but they "consciously disregard" that risk.[9]

7.      Students who recklessly threaten mass violence are subject to school discipline. In 2023, Tennessee added new language to Tennessee's school discipline statute, *requiring* school principals to impose a one year, zero-tolerance expulsion against students who threaten mass violence. If a reasonable person would hear the speech as bluster, non-serious, hyperbole, slang, or a joke, the speech is not a threat of mass violence.

8.      To determine whether a "threat" is "valid," the school *must* require the student making the alleged threat to undergo a "threat assessment." Tenn. Code Ann. §49-6-3401(g)(5). If

---

[1] Tenn. Code Ann. § 39-16-517.
[2] Tenn. Code Ann. § 39-16-517 (a)(1).

the threat is assessed not "valid," then *no* expulsion is allowed, though lesser discipline is permissible. Tenn. Code Ann. §49-6-3401(g)(5).   Under no circumstances can that "lesser discipline" result in a removal from "the student's regular school program where the violation occurred." Tenn. Code Ann. §49-6-3401(g)(6).

9.     In other words, students may only be expelled, suspended out-of-school, or remanded to an alterative school when they have made a *valid* threat. " And only if the threat is determined valid is a report to law enforcement required. Tenn. Code Ann. §49-6-4301(a)(3). Only *valid* threats are crimes of mass violence.

10.     The use of "threat assessment teams" was hardly new. Under state law, school districts have been required to establish threat assessment teams to prevent violence and "create a system" for safe schools.[3]  They must include law enforcement personnel, often County Student Resource Officers (SROs), who then receive access to confidential school records to determine genuineness of threat.[4]

11.     It is the "local law enforcement or mental health service providers," here the Marion County Sheriff's Department, who must provide the threat assessment teams training "on how to assess individuals exhibiting threatening or disruptive behavior and develop interventions."[5] Importantly, that is far different than interrogation to determine probable cause for arrest.

---

[3] Tenn. Code Ann. §49-6-2701(a).

[4] *Id*. This role is different from law enforcement officers issuing probable cause for arrest.  In fact, the Team's work is protected by the Family Educational Rights and Privacy Act (FERPA). *Id*. at (c). Any FERPA-protected information a law enforcement officer receives as part of a threat assessment team cannot be shared beyond the team, even to other members of the officer's agency.

[5]  Tenn. Code Ann. §49-6-2701(c).

*"Stop Tapping that Pencil Before I Bomb [You/This Place]"*

12. On August 20, 2024, toward the end of Mr. Pelphrey's English class at South Pittsburg High, John Doe, age fourteen, was irritated by the actions of his classmate. His classmate, who was also Doe's teammate on the football team, was purposefully drumming a pencil on John Doe's desk while John was trying to work on a lesson. Frustrated, Doe told him, "Stop tapping that pencil before I bomb you."[6]

13. Mr. Pelphrey heard the pencil-tapping as well as Doe's rejoinder.[7] But because Doe's speech included the word "bomb," Mr. Pelphrey sent him to the principal's office.

14. Doe did as he was told, walking to the principal's office. Pelphrey did not escort him nor search him. At 10:33 a.m., Pelphrey sent the principal, Ms. Nelson, an explanatory email. It said: "[John Doe] loudly said, 'I'm going to bomb this place if you don't stop' in response to a student tapping their pencil on the desk. I immediately sent him to the office as we have to take things like this seriously." Thus, it captured the provocation (the tapping pencil) and Doe rejoinder ("loudly," according to Pelphrey).

15. Importantly, no one, including Pelphrey, *literally* believed Doe was going to "bomb" anyone or any place. It was understood to be hyperbole, a statement for effect, not a serious statement, one provoked by the pencil-tapping.

16. That Doe was not truly threatening a bomb is plainly demonstrated by the context: (a) this was a teenage boy (14 years old) spouting off to the irritating stimulus; (b) Doe was not

---

[6] This figure of speech, "bomb you," was meant to convey, in a non-serious way, to fight back, with Doe saying he probably chose "bomb" because he plays "Call of Duty," a video game of war and fighting popular among teen boys.

[7] Pelphrey believed Doe said he was going to bomb "*this place*," not "you," but understood the retort was *to the pencil-tapping*.

searched for any bomb or plans by Pelphrey; (c) Doe was not accompanied to the office by Pelphrey; (d) Pelphrey himself would later testify that he thought it was "highly unlikely" Doe planned to bomb anyone; (e) Pelphrey did not even have in mind Tennessee's mass violence law; (f) the student to whom the speech was directed did not perceive it as a real threat; (g) none of three students who heard the remark perceived it as a real threat—they all thought Doe was just *joking;* (h) no fighting broke out; (i) school continued as normal in the next period, including Mr. Pelphrey's class.  Thus, Doe engaged in constitutionally protected speech.

*In the Principal's Office*

17.     South Pittsburg High's principal, Ms. Kelli Nelson, read Mr. Pelphrey's email and received Doe in her office. As a principal, she had been told of Tennessee's mass violence law a few months earlier, that summer of 2024, but she had not yet been trained on it.

18.     Nelson had been told South Pittsburg High needed a "threat assessment team." According to Principal Nelson, she created a threat assessment team at the start of the 2024-25 school year. The team consisted of herself, a counselor, an assistant principal, a teacher, and the School Resource Officer (SRO), Deputy Brandon Price of the Marion County Sheriff's Department.  Though assembled, she admits no training had been conducted on when, or how, to conduct a threat assessment.

19.     Without any training on threat assessment, Principal Nelson was unsure what to do. Instead of convening the threat assessment team to determine context, validity, etc., she reached out to Deputy Price of the County (the SRO).  In her mind, she was asking for guidance, not for a custodial interrogation to determine probable cause for a crime.

20.     Deputy Price entered Principal Nelson's office at 10:41 a.m., eight minutes after Mr. Pelphrey's email to Ms. Nelson. What then unfolded was clearly a custodial interrogation of John Doe, all captured on Deputy Price's video (since produced in discovery in this case).

21.     Principal Nelson gave SRO Price a brief summary. Captured on camera, Deputy Price Doe about context: "What was your *meaning* behind 'I'm going to bomb you?'"  Doe truthfully responded: "I was not being serious."

22.     Principal Nelson and Deputy Price understood Doe was not going to "bomb" anyone or any place. Both untrained by the school district and the County, respectively, they *thought* intentions did not matter and that certain words alone were now crimes, as if figurative speech, metaphors, hyperbole, or jokes using those words were prohibited.

23.     They said so clearly. First, Deputy Price said:  "But the thing is it don't matter if you're being serious." Nelson echoed: "It really doesn't matter."  And Deputy Price reiterated: "None whatsoever."

24.     Making plain their obvious lack of training about determining a "valid" threat, the intent standard under the Mass Violence Law for schools, the need for a threat assessment team, the role of law enforcement, and the First Amendment, SRO Price told Doe that he had committed a "threat of mass violence."

25.     Continuing with this literalism, and the banning of *words,* no matter their context or intent, together Price and Nelson instructed Doe, all caught on the camera:

- "That's a threat of mass violence." (Price)

- "All we have to go on is what comes out of your mouth." (Nelson)

- "Words like that in today's society cannot be said in a school building." (Nelson)

- "You can't say I'm gonna shoot, or I'm gonna kill, or I'm gonna hit, you can't say any of those things anymore." (Nelson)

- "He admitted to saying 'I'm gonna bomb you'" (Nelson)

- "Now you've put us in a bad situation, in a bind here." (Nelson)

- "Our SRO has to make a decision here. We are required by law to take this seriously now." (Nelson)

- "We are. I mean, I don't have no choice about what's got to be done." (Price)

- "I just went to a meeting…and we are not playing games with these kinds of discussions any more." (Nelson)

26.     Neither Nelson nor Price believed the comment was truly threatening. In fact, at no time was Doe searched for any bombs or other weapons. Nelson and Price were focused on the literal word that "came out of your mouth," a word which "you can't say" anymore—"bomb."

27.     At 10:45 a.m., with Doe still in the office, Principal Nelson stated, "Now, do I think you would *do* that?" Deputy Price shook his head "no," while Nelson continued, " I don't know you well enough, but I hope that you would never do something like that *but because you said it*, I mean, you are responsible for what comes out of your mouth."

28.     This further showed—"because you said it"—that intention did not matter. In fact, Nelson and Price concluded that Doe, age fourteen, had simply let his "emotions get the best of him," but *because of the word,* "we don't have a choice anymore." In sum, without training, they seized and questioned Doe because they wrongly believed his use of a word—"bomb"—was criminal.

29.     This misplaced belief—a clear violation of the First Amendment—is part of a larger custom, policy or practice within both the school district and the County Sheriff's Department.

30.     On June 17, 2024, the Marion County Sheriff's Office and the Marion County Public Schools (the School District) entered a Memorandum of Understanding (MOU) outlining the scope of work of School Resource Officers (SROs").  It included South Pittsburg High School.

31.     The MOU states that an SRO is "significantly different than that of a traditional police officer" and that "the SRO position requires skills and knowledge that may not be addressed in traditional law enforcement training."  Being inside the school, training of the SROs should be done "*collaboratively by SROs and school personnel*." That is, per the MOU, "[b]oth should take an active role in training school personnel regarding emergency management issues."

32.     In spite of the MOU, no training occurred for the either Principal Nelson or SRO Price.  That includes collaboratively or otherwise.[8] They both understood that literalism—not context, validity, circumstances, or intent—carried the day, a serious infringement on First Amendment rights.

33.     The events of August 20th illustrate a textbook lack of training by both the school district and the County on the First Amendment, Tennessee's Mass Violence Law, and Threat Assessment protocols.  Untrained Principal Nelson made a law enforcement referral *without* assessing the threat, in a case where no exigent circumstance existed.  And Deputy Price, whom Nelson put on the threat assessment team, but who also had no training, began a custodial

---

[8] Per the MOU, school officials like Principal Nelson and law enforcement officers like Deputy Price have separate and entirely distinct spheres of responsibility. "The SRO shall not act as school disciplinarians" and "shall not be involved in the enforcement of disciplinary infractions that do not constitute violations of law." That's the principal's job. Instead, "the SRO shall retain full law enforcement authority and will take law enforcement action as appropriate." When necessary, "the SRO may, in accordance with applicable state and federal laws regarding the questioning of juveniles, conduct formal police interviews with students." Under the MOU, principals question and discipline students for their disruptive conduct. Police officers interrogate and charge students for their *crimes*.

interrogation for a crime. In other words, SRO Price was "copping," not acting as a threat assessment school team member.

34.     Due to the gross lack of training, *both* Nelson and Price mistakenly believed it was a crime to say the *word* "bomb" at school in a non-serious manner, even though literally no one believed Doe posed any true threat. And they gained this understanding through a larger custom, policy, or practice.

35.     Both Principal Nelson and Deputy Price contacted their respective superiors. At 10:46 a.m., Deputy Price said, "let me call my office" to determine next steps. And Principal Nelson agreed it was appropriate to defer to the Sheriff's office to "find out what we're doing."

36.     Both Deputy Price and Principal Nelson received instructions from their superiors that, regardless of intent, Doe had used the *word* "bomb" and must be arrested and expelled, respectively. At 10:50 a.m., with Doe still in custody, both Deputy Price and Principal Nelson stated to Doe that their "hands are tied," as if reason, context, validity, use of a threat assessment team, were not possible.

37.     And with that, at 10:53 a.m., SRO Price charged Doe with a felony of threat to commit mass violence and took Doe in his police car to the juvenile detention center. Underscoring SRO Price's extreme lack of training, SRO Price never read Doe his Miranda warnings, even though Price concedes he placed Doe under arrest. Not only did SRO Price misunderstand the Threat of Mass Violence law, SRO Price failed to carry out one of law enforcement's most basic Constitutional responsibilities when taking a *child* into *custody*, seemingly because he didn't know he needed to.

38.     As a result of his speech, Doe suffered adverse action from both law enforcement and his school district. For its part, the Marion County Sheriff's Department, through SRO Price,

seized Doe, interrogated him, and transported him to Juvenile Detention where he was charged with a felony in violation of the First Amendment—despite *not* being serious, no one even *thinking* he plausibly planned to bomb the school, and without any threat assessment at all. Simultaneously, the school district, Principal Nelson, expelled Doe for 365 days with rights to appeal to a Disciplinary Hearing Authority (DHA).

39.     The seizure by law enforcement is an adverse action by the County that resulted from Doe's protected speech. And the school's referral to law enforcement and expulsion of Doe from South Pittsburg High are adverse actions by the school district that resulted from Doe's protected speech.

*After-the-Fact Statements Threat Assessment Team Determines
There was No Imminent Threat of Mass Violence*

40.     To SRO Price, and more broadly the Marion County Sheriff's Department, he was to act solely with traditional police powers as if his "beat" were the school—probable cause for arrest, never a *team-based threat assessment* of teens in collaboration with school officials, regardless of the MOU, and regardless of law enforcement determining *whether* a threat of mass violence is "valid" as part of a threat assessment team.

41.     Instead of acting in concert with the school district to determine "validity," as contemplated by both the MOU and the Threat of Mass Violence law, Deputy Price acted on his own. Having already charged Doe with a felony on August 20, 2024, he went back and interviewed the students who heard Doe's remark *the day after*, August 21, 2024. He obtained handwritten statements of the three students sitting beside Doe at the moment Doe made his remark.

42.     All three who heard the statement confirmed they did not take Doe literally and understood, in context, that he was joking. The first student, the pencil-tapper, wrote: "I was tapping on his desk and he said stop before I bomb this place but *he was joking*." (emphasis added).

43.     The second student wrote: "I wasn't scared because *I figured he was joking.*" (emphasis added).

44.     The third student wrote: "I just heard his [sic] say stop before he bomb [sic] the school. it didn't make me feel anything because I knew he *wasn't being for real because he jokes* a lot. I don't know if he has any problems at home or anything but *he said it in a joking way."* (emphasis added).

45.     For her part, Principal Nelson took actions after-the-fact of expulsion too. Again for lack of training, Principal Nelson clearly did not know what to do. With Doe already arrested and expelled, she created a "Full Threat Assessment Case Worksheet," now *two days after Doe's arrest*, August 22, 2024.

46.     According to Principal Nelson, Deputy Price was part of the threat assessment team. Certainly, there was no other law enforcement member (required by the threat assessment law). SRO Price, however, says that's not so.  According to SRO Price, he was under strict orders from the County Sheriff's Department *not* to be a member of any threat assessment team.  SRO Price says he would not have been a part of a team, that he couldn't be, and, had Principal Nelson asked him, he would have refused to be.

47.     SRO Price never provided Principal Nelson with the three exonerating statements that he took on August 21, 2024. Principal Nelson *never* saw them, as they were not shared by the County Sheriff's office either.  And Principal Nelson did not try to take her own statements from these students.

48.     Even though the statements were not shared, Principal Nelson concluded (she still says it was a "Team Decision") that there was no imminent threat of violence to others or any emergency.  According to the conclusions in the Full Threat Assessment Case Worksheet, Doe did

*not* commit a Priority 1 level issue which requires law enforcement notification. Instead, Principal Nelson concluded (again, she says it was a "Team Decision," but without the statements) that Doe posed a *non-imminent threat*, a Priority 2 level.

49.     Clearly, the County law enforcement and school district were not working cooperatively under the MOU or the threat of Mass Violence law. Even though the threat was not a "valid" threat of mass violence, and even though Principal Nelson invoked the expulsion beforehand, she never revoked it to return Doe to South Pittsburg, as T.C.A. § 49-6-3401(g)(6) required her to do.

50.     Principal Nelson was plainly completing papers about "Priority" levels after-the-fact because she lacked training. The school district clearly *lacked* policies and procedures about handling non-imminent threats of mass violence under the Mass Violence Law, Tenn. Code. Ann. §39-16-517, consistent with the First Amendment. In fact, the school district did not even have a written policy implementing the Threat of the Mass Violence Law.[9]

51.     Ultimately, without training, Principal Nelson admits she did not know how, or when, the threat assessment team should be engaged. And to this day, she still does not know.

*Doe's Botched Disciplinary Appeal Withholds Critical Evidence*

52.     One day after the threat assessment, now August 23, 2024, the school district convened a disciplinary hearing authority ("DHA") to hear Doe's appeal of his expulsion. Neither Principal Nelson, nor Deputy Price, nor Mr. Pelphrey appeared.[10]

53.     Doe did appear. He repeated to the DHA what he had said to his friend, "stop tapping that pencil before I bomb you." Referring to Tennessee's mass violence law, the presiding

---

[9] School District's Answer to Plaintiff's Interrogatory No. 1.

[10] Pelphrey submitted his statement saying: "student shouted I'm going to bomb this place if you don't stop in response to a student tapping a pencil on the desk."

officer, Chair David Smith, repeated the same misunderstanding about *words:* "*The use of the word 'bomb' is now just a zero-tolerance thing in the state of Tennessee.*"

54.     Putting it in football terms, Smith said, "it's like in football when they want to make sure there's no hand checking by defensive backs, they want to focus on that. It's a new focus." That "new focus," Mr. Smith reiterated, meant that Doe's "s*aying* the word 'bomb' automatically set off the radar."

55.     Mr. Scott Evans of state homeland security arrived at the hearing. Despite the threat assessment being completed a day earlier, Evans wrongly told the DHA that *no determination had been made about whether Doe posed a threat of mass violence*. Not only had a determination been made, but three exonerating statements by the SRO in the school had been taken. Weirdly, Evans talked about a *different* student who watched cartoons and murder shows, prompting Doe's mother to state the obvious: "That's a different kid."

56.     No one corrected Evans' misstatement about the threat assessment. This was a material omission considering that Doe had been found to have committed no threat of mass violence already. That finding was in the school district's possession, was certainly known to Principal Nelson, and certainly should have been part of any disciplinary packet forwarded to the DHA, along with the three exonerating statements of the students. But it was all withheld.

57.     Listening to the absurdity that Doe's word could be considered a threat of mass mass violence, with Doe beginning to cry about having been arrested and expelled, one of the board members blamed the *legislation* for Doe's situation: "This is our legislature's kneejerk reaction," and it is just "how the law is written out."

58.     But that's not right either. The kneejerk reaction was the school district's and the County's, now being ratified by the DHA board. They too criminalized a *word* where the statute criminalizes a *context* in which the word is used.

59.     Despite the absurdity, and the agreement among all that Doe did *not* make a threat of mass violence, the DHA did not void all discipline. Plainly believing the utterance of the word did violate the statute, the DHA instead reduced Doe's expulsion to a one-semester placement at the Marion County Alternative School and told him he could appear further to the school superintendent.

60.     This, too, violated the First Amendment and Tennessee's mass violence statute. If there is no "valid" threat of mass violence, the student may *not* be removed from the student's regular school program where the violation occurred. Tenn. Code Ann. §49-6-3401(g)(6). Telling Doe he may not use the word, and then changing an expulsion from school to an expulsion to the alternative school, is illegal. *Id*.

61.     Without being a valid threat, and with the exonerating statements, and with no one believing Doe truly intended any "bomb" anywhere, to any person, the school district should have simply removed the punishment or modified the punishment to a maximum suspension of ten days (anything greater is an "expulsion" under state law, which is impermissible per Tenn. Code Ann. §49-6-3401(g)(6).

62.     The alternative school proved a vastly inferior education.  It is a small, separate building consisting of two rooms ("long term" and "short term") where "lessons" consist of the students logging onto a computer.  Assigned to "long term," a monitor sits in the room while the students sleep and/or work on the computerized lessons.  There is no peer interaction on lessons and there is no live instruction.

63.     Due to being placed in the alternative school, the school district stripped Doe of participating in any extracurricular programs including sports.  He was banned from all school property other than alternative school, meaning he was removed from sports, extracurriculars, school functions, and all school events. This harmed Doe both educationally, as well as emotionally, stigmatized him, and caused him to suffer deep humiliation and embarrassment.

64.     On August 29, 2024, Doe timely appealed the DHA decision to the school district's director of schools, Dr. Mark Griffith.  Doe's parent requested "to review in writing the procedures for this appeal."

65.     On September 5, 2024, Griffith advised by email that after his review, "I am *going to* uphold the recommendation of the committee." (emphasis added).  Doe's parent believed that an "appeal" meant an in-person meeting, like the DHA appeal was in person. So she asked Dr. Griffith whether they could meet in-person before the decision was finalized. Dr. Griffith obliged, hearing from Doe himself in-person on September 9, 2024.

66.     Unfortunately, just like the principal and the SRO and the DHA, Dr. Griffith operated under the misconception that words—regardless of their context or intent—are now criminalized. Dr. Griffith said so:  "This young man *said the word 'bomb.'*"

67.     Doe's family pointed out his positive traits—musician at the church, a devotional leader—and Doe said, "I've never been in trouble like this. I am a good kid….I hope some people can see that I am…I just want to go back to school."

68.     Seemingly moved, Dr. Griffith asked the status of Doe's juvenile court proceedings. The family advised that an appearance would occur September 12, 2024.  Dr. Griffith then stated that he would "talk with the court officials" and make his decision "in writing" on the Friday after

that hearing. This decision would be delivered to Doe's mother, reiterated Dr. Griffith, in writing, on that Friday.

69.     But Dr. Griffith did not deliver his decision that Friday and, to date, still has not. Nor did Dr. Griffith tender the appeal to the school board. In sum, he left in place the violation of the First Amendment and Tennessee's mass violence law with no further appeal.

70.     Doe's appeal was never heard by the Board. Doe remained stuck in alternative school, all extracurricular activities lost, banned from sports, no live teachers, a vastly inferior education, banned even from school property.[11] He remained expelled even though no one—not Pelphrey, not the classmates, not Doe, not Principal Nelson, not SRO Price, not the DHA, and not superintendent Griffith—thought he posed a threat of committing mass violence with a bomb. For lack of training throughout the entirety of the systems—both the school district and the SRO's Sheriff's department—Doe was charged and expelled for a *word* used in a non-serious manner.

### III. LEGAL CLAIMS

*First Amendment and Section 1983*

71.     The First Amendment protects the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[12] Doe's speech was exactly that kind of hyperbole. His speech was not a "true" threat.

---

[11] MCBE made Doe serve the entire expulsion to alternative school.
[12] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

72.     Nor did Doe's speech, provoked by the pencil-tapping on his desk at the end of class, "*substantially and materially disrupt*" the learning environment.[13] He was not indecent, lewd, or vulgar with his speech. And he left the classroom, as requested, without any fighting, without any escort, without any search, and with class resuming next period.

73.     For *not* making a valid threat of mass violence, the school district and the County treated him as if he had. Without training on correct procedure with a correct model, the school district and the County will continue violating students' rights under the First Amendment (retaliation for speech), using policies and procedures under color of law that violated the United States Constitution.

74.     If the threat assessment team determines that the threat assessed is not a "valid" threat of mass violence, then no expulsion is allowed, though lesser discipline is permissible. Tenn. Code Ann. §49-6-3401(g)(5).  And by "expulsion," the student may *not* be removed from the student's regular school program where the violation occurred. Tenn. Code Ann. §49-6-3401(g)(6). If the threat is determined valid, *then* reporting to law enforcement is required. Tenn. Code Ann. §49-6-4301(a)(3). This is what should have happened to Doe—no real threat (a non-serious statement).

75.     The school district's and the County's decision to harshly penalize Doe for use of the word "bomb"—an expulsion and a felony charge, respectively—is a deliberate choice arising from its policies and procedures, including lack of training on them, violating the First Amendment.

76.     Additionally, under Section 1983, the school district and the County were deliberately indifferent by failing to train its decision-makers about use of the threat assessment to

---

[13] *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503 (1969).

determine context, and for arresting and expelling Doe for what was obviously *not* a true threat. This caused Doe both educational and emotional harm.

77.     Defendants, under color of state law, infringed on Doe's First Amendment rights and did so with deliberate indifference.

*Fourteenth Amendment and Section 1983*

78.     The Fourteenth Amendment guarantees the right to due process. Due process has two components: a substantive component, and a procedural component. Substantive due process is, in essence, the right to a "right" result.  Procedural due process is the right to a fair procedure before the government deprives a person of liberty or property.[14] The defendants' actions violated Doe's rights to both.

*i.  Procedural Due Process*

79.     On August 29, 2024, following the DHA hearing, Doe's parent made a timely written appeal. She addressed this, as instructed by the disciplinary hearing official, to the director of schools, Dr. Mark Griffith.

80.     Under Tenn. Code Ann. §49-6-3401(c)(6), after a disciplinary hearing authority hears an appeal, its decision may be appealed to the board of education who "may affirm or overturn the decision of the hearing authority with or without a hearing before the board." A local school board policy may require an appeal to the director of schools first.

81.     Here, Doe made the appeal to the Director of Schools as instructed by the DHA. The Director held an in-person meeting and advised that *he* would make a decision, in writing, by a date certain.  However, a decision *not* given by Dr. Griffith.  And the school board either did not receive the appeal or, if Dr. Griffith did forward it, the school board ignored it. Either way, Doe

---

[14] *Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000).

remained captive to a vastly inferior education at the alternative school, lacking even live teachers, while banned from school property, extracurriculars, and events.

*ii. Substantive Due Process*

82.     Turning to substantive due process, in the context of school discipline, substantive due process violations are admittedly rare. Education is not a fundamental right, and therefore the school's interference with Doe's education— "property"—will be upheld so long the school's actions are rationally related to a legitimate state interest.[15] But here, MCDE's actions *were* arbitrary and irrational, and therefore unconstitutional.

83.      No one believed Doe's words were truly threatening. Again, Doe was expelled simply because *his words* contained a buzzer word, "bomb," no matter the context, no matter the intention. Expelling a student for making a threat that no one perceived as threatening is not rationally related to any legitimate state interest.

84.     For relief,  Plaintiff seeks:

a.      Declaratory relief of the Constitutional violations.

b.      Injunctive relief to remove or remedy the penalty of the alternative school discipline, and training for school officials on handling context-specific language in schools consistent with T.C.A. § 39-16-517(b)(1) and the "true threat" doctrine.

c.      Compensation for humiliation, mental anguish, and damage to his reputation.[16] for which he seeks recovery.

---

[15] *Id.*

[16] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages … are mandatory.").

d.      Nominal damages for the Constitutional violations.[17]

e.      Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

85.     A jury is demanded for all claims triable by jury.

Respectfully submitted,

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

## CERTIFICATE OF SERVICE

The foregoing (proposed) First Amended Complaint has been filed with the Court through its ECF filing database and to all attorneys of record, including Thomas Hickey, attorney for Marion County, and D. Scott Bennett, attorney for Marion County School District, on this 5th day of June 2025.

**SPICER RUDSTROM PLLC**

B. Thomas Hickey
537 Market Street, Suite 203
Chattanooga, Tennessee 37402
*direct:  423.541.9809*

*Attorney for Defendant Marion County*

&

**BENNETT & DECAMP**

D. Scott Bennett
James Building
735 Broad Street, Suite 214
Chattanooga, TN 37402
423.498.3791

---

[17] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

*Attorney for Defendant MCSD*

/s Justin S. Gilbert