UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| JOHN DOE, a minor, by and through his parent and guardian, Mary Doe, | ) ) ) | |
|---|---|---|
| | ) | Case No. 1:24-cv-349 |
| *Plaintiff*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Christopher H. Steger |
| MARION COUNTY SCHOOL DISTRICT and MARION COUNTY, TENNESSEE, | ) ) ) ) | |
| *Defendants*. | ) | |

# MEMORANDUM OPINION

Before the Court is Plaintiff John Doe's motion for preliminary injunction (Doc. 19). For the following reasons, the Court will **DENY** the motion.

## I. BACKGROUND

### A. Statutory Background

In 2021, Tennessee added § 39-16-517 to the Tennessee Code, making it a misdemeanor to recklessly threaten "to commit an act of mass violence on school property or at a school-related activity." Tenn. Code Ann. § 39-16-517(b) (2021). A 2024 amendment made such threats a Class E felony. § 39-16-517(b) (2024). Additionally, the statute provides that "[a]ny person who has knowledge of a threat of mass violence on school property or at a school-related activity and knowingly fails to report the threat commits a Class B misdemeanor." § 39-6-517(d)(3).

In 2023, the legislature made such threats of "mass violence" in schools a "zero tolerance offense," defined as "an offense committed by a student requiring the student to be expelled from

school for at least one (1) calendar year." § 49-6-3401(g). On May 1, 2024, the legislature amended § 49-6-3401(g) mandating school directors "require the student submit to a threat assessment to determine whether the threat of mass violence made by the student was a valid threat." *Id.* The student may be suspended from attendance at the school and from school-sponsored activities until the threat assessment is complete. § 49-6-3401(g).

The current version of the statute only requires expulsion for "valid threats;" however, if "the threat of mass violence made by the student was not a valid threat . . . the student shall not be expelled for committing a zero tolerance offense, but may be suspended in accordance with this section." *Id.* Aside from threats of "mass violence," the statute also authorizes principals to suspend students from attendance at the school "for good and sufficient reasons" which include, but are not limited to: (1) "[v]iolence or threatened violence," (2) "[m]aking a threat, including a false report, to use a bomb . . . on school property," or (3) "[a]ny conduct prejudicial to good order or discipline in any public school." § 49-6-3401(a)(3), (12), (13). If a principal determines "an offense has been committed that would justify a suspension for more than ten (10) days," a principal "may suspend a student. . . upon such terms and conditions as are deemed reasonable" provided the student is "advised of the nature of the student's misconduct" and informed of her right to appeal the decision "to the board of education or to a disciplinary hearing authority appointed by the board." § 49-6-3401(c). On appeal, following a hearing, "the board of education or the disciplinary hearing authority may affirm the decision of the principal, order removal of the suspension . . . assign the student to an alternative program or night school or suspend the student for a specified period of time." *Id.* A hearing must be held within ten days of the student's suspension. *Id.*

### B. Factual Background

On August 20, 2024, while in English class at South Pittsburg High School, Plaintiff John Doe ("Doe"), a ninth-grade student at the time, (*see* Doc. 20-2, at 7), became "irritated by the actions of his classmate" who was tapping pencil on Doe's desk. (Doc. 17, at 4.) Doe asked the student to stop tapping his pencil, but the student said "no." (Doc. 20-2, at 18.) The student proceeded to tap his pencil louder, further annoying and aggravating Doe, who then said to the student "if you don't quit, I'm going to bomb you."[1] (*Id.*) Doe recalls that he made this statement loudly enough for the "whole class" to hear him, and that he said the statement in a tone that indicated he was serious and wanted the student to stop tapping the pencil. (*Id.* at 19.) Doe explains he chose the words "bomb you" or "bomb this place" because he was thinking about a video game, *Call of Duty*. (*Id.*) After Doe's statement, the "entire class became quiet" (Doc. 29-3, at 1) and Doe heard a classmate say, "you can't say that," after which Doe realized he made a big mistake. (Doc. 20-2, at 20.)

At that point, Doe's teacher, Mitchell Pelfrey immediately instructed Doe to go, unescorted, to the principal's office. (Doc. 20-3, at 10.) Pelfrey stated he thought it was "highly unlikely" that Doe was going to bomb the school at that moment; however, he made the disciplinary referral because he believed Doe, "in an irritated and loud tone, made a threat to another student." (*Id.* at 10–11.) According to Pelphrey, Doe's statement caused a "disruption"

---

[1] Both parties note that there are some inconsistencies in the record regarding whether Doe said, "I'm going to bomb *you*" or "I'm going to bomb *this place*." (*See* Doc. 20, at 5, 6 n.2; Doc. 29, at 2 n.1; Doc. 31, at 2) (emphasis added).

3

to his class, which he described as "derail[ing] the work and efforts of his students."² (*Id.* at 10). The class ended only a few minutes after Doe made this comment. (*See* Doc. 20-3, at 5.)

Pelphrey—who had five years of teaching experience at the time—stated that "based on his experience as a teacher" and prior training he "received on threats of any nature" he believed a disciplinary referral to the principal was necessary. (*Id.* at 11.) Pelphrey also sent an email to principal Kelli Nelson ("Nelson"), stating Doe "loudly said 'I'm going to bomb this place if you don't stop' in response to a student tapping their pencil on the desk. I immediately sent him to the office as we have to take things like this seriously." (Doc. 20-4, at 1.) Class ended approximately two minutes after Doe left for the principal's office and Pelphrey taught his next class "as usual." (Doc. 20-3, at 5.)

After reading Pelphrey's email, Nelson walked over to Doe's class where she met him outside the classroom. (Doc. 20-5, at 6.) On the way to her office, Nelson asked Doe, "are you mad?" and "did this really happen?" (Doc. 20-5, at 6.) Once in her office, she asked Doe again if he was upset, and "did you say you were going to bomb this place" to which Doe replied "no, I said I'm going to bomb you." (*Id.*) Shortly after, the assistant principal, Heath Grider came to Nelson's office. (*Id.*) Nelson and Grider spoke briefly in the conference room and in her deposition, Nelson stated she "thought this was very serious" and that they "needed more guidance." (*Id.* at 7.) The two adults returned to Nelson's office and asked Doe several more times whether he was mad or upset; Doe "put his head down and was texting" and Nelson felt she "didn't really get more out of him." (*Id.* at 8.) At that point, she decided to call the school resource officer, Brandon Price ("SRO Price"), for guidance. (*Id.*) Once in Nelson's office,

---

² Pelphrey further described that "[Doe] hit his hands down on his desk as he said it . . . Doe's tone and body posture led me to believe that he was coming out of his chair. The entire class became quiet." (Doc. 29-3, at 1.)

SRO Price determined he needed to call his supervisor and Agent Evans of Tennessee Office of Homeland Security.[3] (*Id.* at 9.) Nelson called Doe's mother as well as the superintendent to ask if she needed to refer Doe to the Disciplinary Hearing Authority ("DHA"). (*Id.* at 10.)

SRO Price and Nelson then questioned Doe and recorded the conversation on SRO Price's body cam. (Doc. 26, Exhibit 8.) After asking Doe to repeat his statement, SRO Price and Nelson expressed concern that his statement was "a threat of mass violence." (*Id.*) SRO Price asked Doe "what was your meaning behind 'I'm going to bomb you?'" to which Doe implied he was not serious when he made the statement. (*Id.*) SRO Price responded by saying "the thing is it don't matter if you're being serious" and Nelson told Doe, "you can't say I'm gonna shoot, or I'm gonna kill, or I'm gonna hit, you can't say any of these things anymore." (*Id.*) While still recording on his body cam, SRO Price subsequently took Doe to the juvenile justice center and "charged Doe with a felony to commit mass violence." (*Id.*; Doc. 17, at 9.) At no point during the body cam footage did SRO Price provide any *Miranda* warnings. (Doc. 26, Exh. 8). Doe received an "out of school suspension" that same day, pending a threat assessment and referral to the DHA. (Doc. 20-5, at 15.)

The day after Doe's suspension, SRO Price—under instruction from Agent Evans—collected written statements from three of Doe's classmates who were present during the incident to assess the context of Doe's statement and determine whether Doe was joking. (Doc. 20, at 9.) The three written statements all indicate the students' believed Doe was joking "because he jokes a lot." (Doc. 25.) Two days after Doe's suspension, Nelson, also under guidance from Agent

---

[3] Prior to this incident, in July or August 2024, Agent Evans was introduced to all the principals in the district at a principals meeting and told the administrators he would provide additional training on mass violence law and threat assessments later in the 2024–2025 school year. (Doc. 20-5, at 3–5.)

Evans, convened the threat-assessment team which concluded that Doe was a "Priority 2" non-imminent "threat of violence to others" as reflected in the "Full Threat Assessment Case Worksheet."[4] (Doc. 20-6, at 6.) The threat-assessment team referred Doe to the DHA for a 365-day expulsion for making a bomb threat, pending automatic review by the DHA.[5] (*See* Doc. 20, at 10; Doc. 20-8, at 3; Doc. 29-6, at 1.)

On August 23, 2024, three days after the incident in English class, the DHA held a hearing to discuss Doe's appeal of the threat assessment determination and Doe's expulsion. (Doc. 29-6, at 1.) During the hearing, the DHA "heard from an assistant principal at [Doe's] high school; John Doe; Doe's mother; Doe's pastor, James Jackson; and Homeland Security Agent Scott Evans, who had interviewed Doe at the South Pittsburgh Police Department." (*Id.* at 1–2.) The DHA also considered "paperwork from the school, the report of the threat assessment team, and letters submitted on behalf of Doe's character." (*Id.* at 2.) The DHA "overturned the Level IV referral" and determined that, while "Doe had not made an actual bomb threat," the DHA believed Doe "had made a threat based on the results of the threat assessment team and even the statements of Pastor Jackson who stated that . . . saying 'bomb' means you are about to 'throw hands,' meaning start a fight." (*Id.*) Consequently, the DHA determined Doe "committed a Level III offense, a threat to another student."[6] (*Id.*) Instead of the 365-day

---

[4] This worksheet's self-described purpose is "to assist in determining whether the person / situation poses a threat of violence to others, to self, or to both (or poses no threat of violence)." (Doc. 20-6 at 1.) The assessment worksheet also includes a list of the participating parties and instructions on how to assess threats of violence. (*Id.* at 1–6.) Additionally, Nelson notes that Doe's threat assessment was the first one she ever completed. (Doc. 20-5, at 14.)

[5] According to the Marion County Board of Education's Student Code of Conduct, a bomb threat is one example of a "zero tolerance" offense that "shall be reported to the director of schools and the Board for expulsion and will also be reported to law enforcement officers." (Doc. 29-6, at 4.)

[6] According to the Marion County Board of Education's "Student Code of Conduct," examples of a "Level III Offense" include "Other Types of Threat (Verbal, Written, or Electronic)" and

expulsion, the DHA "remanded John to an alternative school for a semester," removing him from participating in sports or any other extracurricular activities. (Doc. 20, at 12.) Doe has since completed his semester at the alternative school (*see* Doc. 17, at 16 n.11) and his charge under § 39-16-517 "was ultimately dismissed and expunged." (Doc. 34, at 1–2 n.1.)

### C. Training Provided for School Personnel and SROs

Nelson explains she was "introduced to the [mass violence] legislation . . . when the law was passed" in the summer of 2024 at a yearly summer retreat for administrators. (Doc. 20-5, at 3). During this initial introduction, the superintendent went over "legislative updates and legislative bills that have passed" and informed administrators that a Homeland Security agent would give specific training on the mass violence legislation that had just been passed later in the school year. (*Id.* at 3–5.) Before the incident with Doe, Nelson was tasked with assembling a threat-assessment team. (*Id.* at 5.) By August 20, 2024, Nelson had assembled the threat-assessment team, which included herself, Grider, SRO Price, a junior-high teacher, and the school's counselor. (*Id.* at 5, 15.) However, no one on this threat-assessment team received specific training on the amended mass-violence law until later in the school year, after completing Doe's threat assessment. (*Id.* at 3.) Nelson notes that based on her knowledge today, the distinction between when a student's statement should be referred to law enforcement versus a threat assessment team first "depend[s] on the context . . . how [the statement] was presented. . . . if the student was playing around or joking . . . [or] if the student seemed mad or angry or upset."[7] (*Id.* at 21.)

---

such offenses "are not automatically considered zero tolerance but will be treated as such by the principal unless there are extenuating circumstances." (Doc. 29-6, at 4.)

[7] Nelson also notes that in the context of the statement conveyed to her by Pelphrey she believed it was a serious statement made by someone who was frustrated or irritated. (Doc. 20-5, at 21).

According to Marion County, SROs complete mandatory training "annually to maintain their employment as SROs." (Doc. 31, at 13.) According to SRO Price, SROs receive 16 hours of annual training on their unique responsibilities as SROs, in addition to the mandated 40 hours of training for all deputies in the state. (*See* Doc. 20-7, at 3–4.) In 2024, the district attorney general's office conducted a training on "the new law regarding threats of mass violence." (Doc. 31, at 13.) Additionally, in 2025, the SRO training specifically covered training on threat assessments. (*Id.*) Agent Evans also trained David Smith—the DHA chair—"to understand the requirements of Tennessee's law governing threats of mass violence" including "that the use of the word 'bomb' did not automatically mean Doe was guilty of [a threat of mass violence]." (Doc. 29-6, at 2.)

Finally, at the time of the incident with Doe, SROs—including SRO Price—received a Memorandum of Understanding that "outlin[es] the scope of work of School Resource Officers" and calls for collaborative "[p]lanning and training for emergencies and school safety" as well as an "open exchange of information" that complies with "sheriff's department rules, the school district policies, and all applicable laws, especially FERPA" (Doc. 20, at 16.)

Doe initiated this action on October 31, 2024. (Doc. 1.) In his amended complaint (Doc. 17), he asserts claims against Defendants Marion County School District ("MCSD") and Marion County ("the County") under 42 U.S.C. § 1983 for violation of his First and Fourteenth Amendment Rights. On July 17, 2025, Doe moved for a preliminary injunction. (Doc. 19.) In his motion, he requests that the Court provide the following injunctive relief: (1) order MCSD to

---

When asked whether it would make any difference to her if Doe had said "I'm going to bomb this place" or "I'm going to punch you in the face" Nelson says that "both are a threat. . . . [b]ut bomb this place would, would indicate that other kids would get hurt--you know, lots of people or several people could get hurt." (*Id.* at 22). She further notes that she would take both statements seriously. (*Id.*)

"develop and implement" training policies compliant with Tenn. Code Ann. § 49-6-2701; (2) order the County Sheriff's Office to train SROs on "the statutory requirements for school-based threat assessments, including the limits on disclosure under FERPA and § 49-6-2701"; (3) enjoin the County's Sheriff's Office from allowing SROs to participate in threat assessments unless they are "trained accordingly"; (4) prohibit Defendants from further disciplining Doe based solely on his speech; and (5) grant any other relief "the Court deems just and proper." (*Id.* at 1–2).

## II. STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). When reviewing motions for preliminary injunction, courts must consider the following factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *Id.* at 542 (citation omitted).

These considerations are "factors to be balanced" rather than prerequisites that must each be satisfied before relief may be issued. *McNeilly v. Land*, 684 F.3d 611, 615 (quoting *In re Eagle-Picher Indus.*, 963 F.2d 855, 859 (6th Cir. 1992)). Nor are they "rigid and unbending requirements" rather, "[t]hese factors simply guide the discretion of the court." *Id*. Moreover, in the constitutional context, the last three factors often hinge on the first. *See Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) ("In the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor."). The Court need

not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Tenke*, 511 F.3d at 542 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

Finally, the party seeking injunctive relief bears the burden of justifying such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke*, 511 F.3d at 542 (citations and internal quotations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter*, 555 U.S. at 22), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

Doe argues Defendants violated his First Amendment rights by failing to adequately train SROs and school administrators on properly conducting threat assessments, allegedly leading to Doe's arrest and expulsion solely for his use of the word "bomb." (Doc. 20, at 23.) He brings his claim under 42 U.S.C. § 1983, which provides in relevant part,

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To succeed on a § 1983 municipal-liability claim, a plaintiff must show both (1) that he suffered a constitutional injury; and (2) that the alleged violation was caused by the municipality's policy

or custom. *See Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Even assuming Defendants violated Doe's First Amendment rights when they arrested him and initially expelled him from school for making a threat of mass violence under Tenn. Code Ann. §§ 39-16-517; 49-6-3401(g)(5), Doe has not made a clear showing that he is likely to succeed on the merits of his municipal-liability claim. As Doe's requested relief turns on this failure-to-train claim, the Court does not discuss the likelihood of success on the merits for the underlying First Amendment claim.[8]

### i. *Monell* Liability for Failure to Train

Plaintiff Doe asserts a § 1983 municipal-liability claim based on two alleged failures to act: (1) Defendants' lack of training programs and tools for school resource officers and administrators regarding threats of mass violence and conducting threat assessments, as required under Tenn. Code Ann. §§ 49-6-2701; 3401; and (2) MCSD's lack of written policies implementing § 39-16-517. (*See* Doc. 20.) To succeed on a municipal-liability claim, a plaintiff must establish (1) "that his or her constitutional rights were violated" and (2) that "a policy or custom of the municipality was the 'moving force' behind the deprivation of plaintiff's rights." *Miller v. Sanilac Cty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (quoting *Powers v. Hamilton Cty.*

---

[8] In Doe's amended complaint (Doc. 17), he also raises procedural and substantive due process claims under the Fourteenth Amendment. As Doe has not requested injunctive relief under these claims, the Court also does not address the merits of those claims. Moreover, Doe raises interrelated failure-to-train concerns about Defendants' alleged violations of the Family Educational Rights and Privacy Act ("FERPA"). 34 U.S.C. §§ 99 *et. seq.* As there is no private right of action under FERPA, the Court does not address any concerns raised under this Act. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002) ("FERPA's nondisclosure provisions contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions. They therefore create no rights unenforceable under § 1983.").

*Pub. Defender Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694–95)).

"Failure to train" can act as the basis for a § 1983 claim in "limited circumstances." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *see also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (noting a plaintiff may demonstrate *Monell* liability by showing "the existence of a policy of inadequate training or supervision"). However, the Supreme Court stated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted).

To establish municipal liability based on a failure to train, "a plaintiff must show that: '(1) the training program was inadequate to the task the officer must perform; (2) the inadequacy is a result of the municipality's deliberate indifference; and (3) the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Epperson v. City of Humboldt*, 140 F. Supp. 3d 676, 684 (W.D. Tenn. 2015) (quoting *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 414 (6th Cir. 2015)) (cleaned up). Here, Doe fails to make a clear showing of either a policy of inadequate training or Defendants' deliberate indifference to Doe's First Amendment rights. Consequently, the Court does not consider the third prong in its analysis.

### 1. Inadequacy of Training

Doe asserts that MCSD and the County failed to provide SROs and school administrators with adequate training on conducting threat assessments to determine whether the context indicates the student made a "true threat" of mass violence. (*See* Doc. 20.)

In *Helphenstine v. Lewis County*, the Sixth Circuit explained that training is adequate when personnel can immediately contact others with the requisite training or expertise. 60 F.4th 305, 324–25 (6th Cir.) (citing *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 864 (6th

Cir. 2019) (finding lack of specific medical training for jailers insufficient to support a failure-to-train claim because "those jailers could immediately contact medically trained staff" and rely on their general first aid and CPR training to "bridge the gap" in the meantime).

While Nelson did not have specific training in conducting threat assessments, she was aware of the need to assemble a threat-assessment team (which she completed prior to Doe's threat assessment) and had received a general briefing from Agent Evans about the new changes to Tennessee's threat of mass violence laws. (*See* Doc. 20-5.) She also knew that Agent Evans would be providing specific training later in the school year and "knew enough" to contact him for guidance when conducting Doe's threat assessment. (*Id.*; Doc. 29, at 19.) Similarly, the County notes that SRO Price was required to complete at least 16 hours of training specific to SROs at the time of Doe's arrest, which included assessing the contexts of threats generally. (*See* Docs. 20-7; 31.)[9] As both SRO Price and Nelson were able to receive guidance immediately from Agent Evans at the time they conducted the threat assessment, their general training on assessing threats was enough to "bridge the gap" before contacting Agent Evans for specific guidance.

Additionally, the Defendants point out the DHA chair, David Smith, had specific training on threats of mass violence at the time of Doe's hearing. (Doc. 29, at 20 n.10.) The DHA overturned Doe's 365-day suspension after similarly determining Doe did not make a threat of mass violence. (*See* Doc. 20-8, at 3.) As such, all parties involved in disciplining Doe had the requisite training required or means of communicating with key players who had such expertise.

---

[9] Additionally, the County notes that SRO Price has since received specific training on conducting threat assessments. (*See* Doc. 31, at 13.)

Consequently, Doe has not met his burden in showing a substantial likelihood of success that the training on threat assessments was inadequate.

### 2. *Deliberate indifference*

Even if the training was inadequate, Doe must still show a substantial likelihood that Defendants' failure to specifically train school employees and SROs on conducting threat assessments amounted to a deliberate indifference of Doe's First Amendment Rights. *See Shadrick v. Hopkins Cty.*, 805 F.3d 724, 737 (6th Cir. 2015) (explaining the "deliberate indifference" standard refers to the defendant's "responsibility for training and supervising its [employees] concerning their legal duty to honor [plaintiff's] constitutional right[s]") (citations omitted).

"Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* (quoting *Bd. Of Cty Com'rs v. Brown*, 520 U.S. 397, 410 (1997). This standard has both objective and subjective components; the subjective component requires a "culpable state of mind" that is roughly equivalent with recklessness. *Id.* To prove deliberate indifference, plaintiff must show either "(1) a pattern of similar constitutional violations by untrained employees or (2) a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for constitutional violation." *Helphenstine*, 60 F.4th at 323 (internal citations and quotation marks omitted). As Doe has not alleged a pattern of similar violations, he must show likelihood of success on the requirements for a single violation of federal rights.

When a plaintiff pursues a single-incident theory of liability, causation can be gleaned from the "high degree of predictability" that "the failure to train would so obviously and

foreseeably result in the alleged constitutional injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 n.10 (6th Cir. 2020) (citations omitted). Notably, single-violation cases require some kind of recurring situation that, without training, poses a risk to federally-protected rights. *See City of Canton*, 489 U.S. at 390 n.10 (determining because the city "kn[ew] to a moral certainty" that its armed sheriffs would "be required to arrest fleeing felons," failure to train on the limitations of deadly force could be "characterized as deliberate indifference to constitutional rights" (citation and internal quotations omitted)); *see also Curry ex rel. Curry v. School Dist.*, 452 F. Supp.2d. 723, 733 (E.D. Mich. 2006) (reasoning that "[a]lthough the absence of prior complaints addresses a different aspect of the failure-to-train proofs. . . . the lack of prior incidents reinforces the conclusion that a reasonable administrator cannot be found to have been deliberately indifferent to the need to train for unlikely happenings").

Here, Doe argues that there's an obvious potential for constitutional violations because under the Tennessee Code, principals are "the disciplinary authorities on their campus," and thus a lack of policies and training on assessing threats and conducting threat assessments constitutes deliberate indifference. (Doc. 20, at 24.) However, unlike *City of Canton*, Doe does not allege any facts indicating that conducting threat assessments and arrests pursuant to Tennessee's mass violence statutes are recurring situations SROs and school principals regularly tackle. In fact, at the time of her deposition, Doe's threat assessment was the first one Nelson had conducted. (Doc. 20-5, at 14). Consequently, Doe has not demonstrated that threat assessments and arrests under Tennessee's mass violence statutes present an obvious potential for constitutional violations.

Additionally, a plaintiff can also show deliberate indifference by demonstrating the municipality implemented a "policy of inaction." *Connick*, 563 U.S. at 61. A policy of inaction

is shown when a municipality fails to implement any kind of training for recurring situations. *Cf. Ouza*, 969 F.3d at 265 (determining "failure to provide *any type of training* as to [] two recurring situations"—probable-cause and use of force—amounted to deliberate indifference). Here, Doe fails to show a policy of inaction from Defendants. Defendants note that at the time of Doe's arrest and expulsion, threat assessments, while "not new, had not been connected to the student discipline process in general or threats of mass violence in particular until . . . May 1, 2024"— only a few months before Doe's threat assessment. (Doc 29, at 4 n.3.) Defendants have since implemented specific training on threat assessments and Tennessee's mass violence statutes for school administrators. (*See* Doc. 20-3, at 3.) Given the newly implemented changes to the legislation and the absence of recurring conditions involving the mass threat of violence statute and threat assessments, Doe has not made a clear showing that Defendants implemented a policy of inaction in training school administrators on threat assessments or changes to the threat-of-mass-violence law.

As for SRO Price, while he might not have received training on the threat-of-mass-violence law at the time, he had received extensive training including training on verbal threats. (*See* Doc. 20-7.) Doe has not provided any evidence to demonstrate that the County acted with deliberate indifference by not including this law specifically in their training other than the fact that SRO Price arrested Doe for his words. Moreover, as discussed above, SRO Price has since received specific training on conducting threat assessments, and Doe provides no evidence to show such training is inadequate. (*See* Doc. 31, at 13.) Thus, Doe has not made a clear showing that Defendants acted with deliberate indifference toward his constitutional right to free speech. As such, Doe has not demonstrated a likelihood of success on the merits for his § 1983 municipal liability claim based on a failure to train.

16
Case 1:24-cv-00349-TRM-CHS    Document 35    Filed 10/24/25    Page 16 of 20    PageID #: 533

## B. Irreparable Harm

"The single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Wright & Miller*, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). A preliminary injunction will be denied if the applicant has an adequate remedy at law. *See First Nat. Bank & Tr. Co. of Michigan v. Fed. Reserve Bank of Chicago*, 495 F. Supp. 154, 157 (W.D. Mich. 1980).

While constitutional cases "often turn on the likelihood of success on the merits" this "general rule does not do away with the 'indispensable prerequisite of showing a likelihood of immediate and irreparable harm." *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, No. 24-5056, 2025 WL 2599923, at *8 (6th Cir. Sept. 9, 2025) (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012; *D.T.*, 942 F.3d at 326–27); *see also D.T.*, 942 F.3d at 327 ("[E]ven the strongest showing on the other three factors cannot eliminate the irreparable harm requirement.") (internal quotations omitted). The party seeking the injunction bears the burden of clearly showing that its "injury [is] both certain and immediate, not speculative or theoretical." *D.T.*, 942 F.3d at 327 (citation and internal quotations omitted). Moreover, when a plaintiff seeks an injunction based on alleged past wrongs, it must show there is an immediate threat that they will be harmed again. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1982) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . .").

Doe argues he has suffered irreparable harm because "[t]he loss of First Amendment freedoms, 'unquestionably constitutes irreparable injury.'"  (Doc. 20, at 26 (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1988)).  Doe suggests that "without an injunction requiring development of a policy with training . . . Doe's speech will again be chilled, and educators confused, as words like 'gun,' 'bomb,' 'knife,' and 'injure' are prohibited."  (*Id.*)  Additionally, Doe argues that, without training for educators and SROs, the "creation of a mass violence policy," "changes to procedure," and "mitigation of the risk of future violations," Doe's free speech rights may be impaired in the future.  (*Id.* at 27).

Doe asserts imminent or irreparable harm based on his claim that he was previously punished for saying the word "bomb."  However, the trainings and written policies that Doe requests to remedy this issue already exist.  Additionally, Defendants point to the Student Code of Conduct, which gives examples of various kinds of disciplinary actions, and existing threat-assessment tools such as the Threat Assessment Worksheet[10] completed by Nelson and the threat-assessment team.  (Doc. 20-6, at 6.)  Doe does not explain how these existing trainings and tools are inadequate, especially considering that both the threat-assessment team and the DHA found that Doe had not made a "true threat" of mass violence.  (*See* Docs. 19, 33, 34).  In contrast, Defendants assert Plaintiff was disciplined for threatening to fight another student and note their determination was based in part on the words of Doe's own character witness at the DHA hearing, in addition to the threat assessment and Pelphrey's belief that Doe was making a serious threat at the time.  (*See* Docs. 29; 31; *see also* 29-6, at 2 (noting that the DHA's decision

---

[10] This worksheet's self-described purpose is "to assist in determining whether the person / situation poses a threat of violence to others, to self, or to both (or poses no threat of violence)."  (Doc. 20-6 at 1.)  The assessment worksheet also includes a list of the participating parties and instructions on how to assess threats of violence.  (*Id.* at 1–6.)

was based in part on Doe's pastor's statement at the DHA hearing, that the phrase "bomb you" is equivalent to "'throw hands' meaning to start a fight").) Consequently, there is no indication Doe faces certain or imminent harm from a lack of training on threat assessments or written policies on threats of mass violence, nor that his speech will be chilled in the future for saying words like "bomb."

Finally, Doe asks this Court to "enjoin[] SROs in Marion County from sitting in on threat assessments." (Doc. 34, at 7.) Doe argues that because Marion County's training for SRO's is allegedly deficient, SROs are "*feigning* a role of 'school official' while in reality acting as law enforcement." (*Id.* (emphasis in original).) This leads Doe to conclude that, "without training on threat assessments, words alone can be criminalized" and therefore, Doe "remains at risk." (*Id.* at 7–8.) Consequently, Doe further asks to enjoin "the District from enforcing expulsion or similar discipline against Doe based solely on his protected speech of non-serious words." (Doc. 20, at 28.) As discussed, Defendants indicate such training already is in place. Moreover, Doe puts forward no evidence that Defendants plan to further discipline him in the future.

Therefore, the harm Doe requests injunctive relief from is neither certain nor immediate. Even if SRO Price and Nelson were not properly trained at the time of Doe's arrest and initial expulsion, Doe does not raise any facts that indicate Doe risks any *actual* imminent future prosecution based on his words alone. *See D.T.*, at 328 (explaining a "hypothetical threat of prosecution is not an 'immediate,' 'irreparable' injury that warrants the 'extraordinary remedy" of a preliminary injunction") (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154) (6th Cir. 1991)).

### C. Harm to Others and Public Interest

The third and fourth factors, harm to the opposing party and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In the constitutional context, whether an injunction serves the public interest is inextricably intertwined with whether the plaintiff has shown a likelihood of success on the merits. *See Liberty Coins*, 748 F.3d at 690 ("[T]he determination of where the public interest lies [ ] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted) (alteration in original)). Doe has not demonstrated a likelihood of success on the merits. The Court therefore cannot conclude that the public interest would be served by requiring Defendants to implement new training or polices, nor by enjoining SROs from sitting in on threat assessments.

### IV. CONCLUSION

For the above reasons, Doe's motion for preliminary injunction is **DENIED**. Additionally, while the Court finds the Plaintiff has not met his burden for granting a preliminary injunction, Plaintiff may still be successful on the merits of his claims at trial. Therefore, the Defendants' request to consolidate the briefings pursuant to Rule 65(a)(2) and enter a judgment as a matter of law is **DENIED**.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**