**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| JOHN DOE, a minor, through his parent and guardian, MARY DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>MARION COUNTY SCHOOL DISTRICT, and MARION COUNTY, TENNESSEE,<br><br>*Defendants*. | ) | Case No. 1:24-cv-349<br><br>Judge Travis R. McDonough<br><br>Magistrate Judge Christopher H. Steger |

---

**MEMORANDUM OPINION**

---

Before the Court is Defendant Marion County School District's ("MCSD") motion for summary judgment (Doc. 43) and Plaintiff John Doe's ("Plaintiff") motion for partial summary judgment against MCSD (Doc. 48). For the reasons stated below, MCSD's motion (Doc. 43) will be **GRANTED** and Plaintiff's motion for partial summary judgment (Doc. 48) will be **DENIED**.[1]

## I. BACKGROUND

### A. Statutory Background

In 2021, Tennessee enacted Tennessee Code Annotated § 39-16-517, making it a misdemeanor to recklessly threaten "to commit an act of mass violence on school property or at a school-related activity." Tenn. Code Ann. § 39-16-517(b) (2021). Following an amendment in

[1] Defendant Marion County, Tennessee ("Marion County") and Plaintiff have filed a notice of resolution of all claims between them. (*See* Doc. 63.) Accordingly, Marion County's motion for summary judgment (Doc. 41) and Plaintiff's motion for partial summary judgment against Marion County (Doc. 46) are **DENIED as moot**.

2024, the legislature elevated such threats to a Class E felony. § 39-16-517(b) (2024). Additionally, the 2024 statute provides that "[a]ny person who has knowledge of a threat of mass violence on school property or at a school-related activity and knowingly fails to report the threat commits a Class B misdemeanor." § 39-6-517(d)(3).

In 2023, the legislature made such threats of "mass violence" in schools a "zero tolerance offense," defined as "an offense committed by a student requiring the student to be expelled from school for at least one (1) calendar year." § 49-6-3401(g). On May 1, 2024, the legislature amended § 49-6-3401(g), mandating that school directors "require the student submit to a threat assessment to determine whether the threat of mass violence made by the student was a valid threat." *Id.* The student may be suspended from attendance at the school and from school-sponsored activities until the threat assessment is complete. § 49-6-3401(g).

The current version of the statute only requires expulsion for "valid threats;" however, if "the threat of mass violence made by the student was not a valid threat . . . the student shall not be expelled for committing a zero tolerance offense, but may be suspended in accordance with this section." *Id.* For the purposes of subsection (g), "'[e]xpelled' means removal from the student's regular school program at the location where the violation occurred or removal from school attendance altogether." *Id.*

Aside from threats of "mass violence," the statute also authorizes principals to suspend students from attendance at the school "for good and sufficient reasons" which include, but are not limited to: (1) "[v]iolence or threatened violence," (2) "[m]aking a threat, including a false report, to use a bomb . . . on school property," or (3) "[a]ny conduct prejudicial to good order or discipline in any public school." § 49-6-3401(a)(3), (12), (13). If a principal determines "an offense has been committed that would justify a suspension for more than ten (10) days," a

principal "may suspend a student. . . upon such terms and conditions as are deemed reasonable," provided the student is "advised of the nature of the student's misconduct" and informed of her right to appeal the decision "to the board of education or to a disciplinary hearing authority appointed by the board." § 49-6-3401(c). On appeal, following a hearing, "the board of education or the disciplinary hearing authority may affirm the decision of the principal, order removal of the suspension . . . assign the student to an alternative program or night school or suspend the student for a specified period of time." *Id.* A hearing must be held within ten days of the student's suspension. *Id.*

Separately, Tennessee law now requires each local education agency to "adopt a policy to establish a threat assessment team" for each school and provides such threat assessment team "shall include persons with expertise in counseling, instruction, school administration, and law enforcement." § 49-6-2701(a)–(b). The statute directs local education agencies to adopt policies and procedures for the "assessment of and intervention with individuals whose behavior may pose a threat to the safety of school staff or students," including developing courses of action in the event that "threatening or dangerous behavior is reported" such as "referral to community services, notifying parents or guardians . . . or notifying law enforcement." § 49-6-2701(c)(7).

### B. MCSD's Written Policies

Four Marion County Board of Education policies are relevant to the parties' motions.

#### *i.* Board Policy 6.313 (Student Code of Conduct)

Board Policy 6.313 (Student Code of Conduct) was issued on July 8, 2024, rescinding the prior version issued on September 20, 2021. (*See* Doc. 29-6, at 3–6; Doc. 45, at 40–43.) This policy authorizes a principal to "suspend/expel any student from attendance at school or any

school-related activity . . . for good and sufficient reasons," and classifies student offenses into four categories. (Doc. 45, at 40.)

Category I offenses include "[m]inor violations of school or classroom rules" and "may result in detention, loss of privilege, demerits, corporal punishment, or suspension." (*Id.*) Category II offenses are those that "may result in suspension or referral outside of school" and include offenses such as harassment, bullying, dishonesty, and computer hacking. (*Id.* at 40–41.) Category II offenses carry a graduated schedule, with first time offenses resulting in a 5-day suspension, second time offenses resulting in a 10-day suspension, and third time offenses requiring referral to the Board of Education for expulsion. (*Id.*) Category III offenses "are not automatically considered zero tolerance but will be treated as such by the principal unless there are extenuating circumstances." (*Id.* at 41.) Examples of Category III offenses include pulling a fire alarm when no fire is visible, possessing explosive material, inciting disruption of school activities, or "other types of threat (verbal, written, or electronic.)" (*Id.* (citation modified).) Finally, for Category IV offenses, "[t]here shall be zero tolerance for the following offenses and these offenses shall be reported to the director of schools and the Board for expulsion and will also be reported to law enforcement officers." (*Id.* at 41–42.) Some of the offenses listed include possessing a weapon, sexual assault, arson, and bomb threats. (*Id.*)

***ii.* Board Policy 6.316 (Suspension/Expulsion/Remand)**

Board Policy 6.316 provides that, "[i]f at the time of the suspension the principal determines that an offense has been committed which . . . would justify a suspension/expulsion for more than ten (10) days" the principal may suspend, expel, or remand—meaning assign the student to an alternative school—the student "unconditionally for a specified period of time" or as "deemed reasonable." (*Id.* at 44–45.) The principal must give written or actual notice of the

right to appeal any suspension exceeding ten days, with appeals to be filed within five days and automatically direct the student "to the Board or to a disciplinary hearing authority appointed by the Board." (*Id.* at 45.)

### *iii.* Board Policy 6.317 (Student Disciplinary Hearing Authority)

Board Policy 6.317 provides that a five-member student disciplinary hearing authority ("DHA") "shall conduct appeals for students who have been suspended for more than ten (10) consecutive school days." (Doc. 45, at 46.) The DHA may: (1) "[a]ffirm the decision of the principal," (2) "[o]rder the removal of the suspension," (3) "[a]ssign the student to an alternative school or program," or (4) "[s]uspend the student for a specified period of time." (*Id.*) Additionally, if the DHA decides to uphold a zero-tolerance offense, such offenses "as set forth in statute requires a mandatory calendar year expulsion unless modified by the Director of Schools." (*Id.* at 47.) Within five days of the DHA's decision, a student "may request a review by the Director of Schools," and within five days of the Director's decision a student "may request a review by the Board." (*Id.*) The Board has discretion to grant or deny a hearing.[2] (*Id.*)

### *iv.* Board Policy 3.204.1 (Threat Assessment Team)

The final Board Policy in the record is 3.204.1, which provides "[a] threat assessment team shall be created within the school district to develop intervention-based approaches to prevent violence, manage reports of potential threats, and create a system that fosters a safe, supportive, and effective school environment," and that "[t]he school district's threat assessment team shall obtain training from local law enforcement . . . on how to assess individuals exhibiting threatening

[2] The copies of Policy 6.317 in the record have an issue date of January 13, 2025, and expressly rescind the prior version issued May 13, 2024. (*See* Doc. 45, at 46.) The May 13, 2024 version governed Plaintiff's appeal in August and September 2024; however, that version is not in the record. As set out below, the Court's analysis does not depend on the text of the January 2025 version.

or disruptive behavior and develop interventions." (Doc. 45, at 39.) The policy assigns the Superintendent the responsibility of "appoint[ing] the members of the threat assessment team" and "develop[ing] administrative procedures regarding the training and operations of the team to comply with state law." (*Id.*) The policy cites Tenn. Code Ann. § 49-6-2701 *et seq.* as its legal authority. (*Id.*)

### C. Factual Background[3]

#### *i. The classroom incident and school officials' response*

On August 20, 2024, while in English class at South Pittsburg High School, Plaintiff John Doe ("Plaintiff"), a ninth-grade student at the time, (*see* Doc. 20-2, at 7; Doc. 53, at 6), became "irritated by the actions of his classmate" who was tapping a pencil on Plaintiff's desk. (Doc. 17, at 4; *see also* Doc. 53, at 12–13.) Plaintiff asked the student to stop tapping his pencil, but the student said "no." (Doc. 20-2, at 18; Doc. 53, at 12.) The student proceeded to tap his pencil louder, further annoying and aggravating Plaintiff, who then said to the student "if you don't quit, I'm going to bomb you."[4] (Doc. 20-2, at 18; Doc. 53, at 13.) Plaintiff recalls that he made this statement loudly enough for the "whole class" to hear him, and that he said the statement in a tone that indicated he was serious and wanted the student to stop tapping the pencil. (Doc. 20-2, at 19; *see also* Doc. 45, at 7; Doc. 53, at 13–14.) Plaintiff explains he chose the words

---

[3] The Court notes that the parties did not file complete deposition transcripts as part of the Joint Appendix (Doc. 40) or its supplements (Docs. 45, 53). Additionally, the parties switch between citing to the two overlapping, but non-identical records filed in connection with the preliminary injunction motion (Docs. 19–34) and the exhibits filed in connection with summary judgment (Docs. 40, 45, 53). The Court cites to both records in an effort to reconcile them and give the reader the clearest path to the underlying evidence. Any citation to one record over another reflects only where the materials appear and not any judgment as to the relative weight or reliability of the evidence.

[4] Both parties note that there are some inconsistencies in the record regarding whether Plaintiff said, "I'm going to bomb *you*" or "I'm going to bomb *this place*." (*See* Doc. 45, at 7, 9, 11; Doc. 53, at 13) (emphasis added).)

"bomb you" or "bomb this place" because he was thinking about a video game, *Call of Duty*. (Doc. 20-2, at 19.) After Plaintiff's statement, the "entire class became quiet" (Doc. 29-3, at 1), and Plaintiff heard a classmate say, "you can't say that." (Doc. 20-2, at 20.) Plaintiff later testified that after hearing his classmate, he realized he had made a big mistake. (Doc. 20-2, at 20; Doc. 53, at 15–16.)

At that point, Plaintiff's teacher, Mitchell Pelfrey, immediately instructed Plaintiff to go, unescorted, to the principal's office. (Doc. 20-3, at 10; Doc. 45, at 9.) Pelfrey testified he thought it was "highly unlikely" that Plaintiff was going to bomb the school at that moment; however, he made the disciplinary referral because he believed Plaintiff, "in an irritated and loud tone, made a threat to another student." (Doc. 20-3, at 10–11.) Specifically, Pelfrey described Plaintiff's statement as causing a "disruption" that "derail[ed] the work and efforts of [his] students." (*Id.* at 10.)[5] When asked whether he would have sent Plaintiff to the office had Plaintiff said, "I'm going to bomb you" rather than "I'm going to bomb this place," Pelfrey answered "[a]bsolutely," explaining that "it was the disruption he caused." (Doc. 29-7, at 2–3). The class ended a few minutes after Plaintiff made this comment. (*See* Doc. 20-3, at 5.) Pelfrey testified that, as of that morning, he had never heard of the threat-of-mass-violence law. (*Id.* at 2.)

Pelfrey—who had five years of teaching experience at the time—stated that, "based on his experience as a teacher" and prior training he "received on threats of any nature," he believed a disciplinary referral to the principal was necessary. (Doc. 20-3, at 11.) Pelfrey also sent an email to principal Kelli Nelson ("Nelson"), stating

[5] Pelfrey further testified that "[Plaintiff] hit his hands down on his desk as he said it . . . [Plaintiff's] tone and body posture led me to believe that he was coming out of his chair. The entire class became quiet." (Doc. 29-3, at 1.)

> [Plaintiff] loudly said "I'm going to bomb this place if you don't stop" in response to a student tapping their pencil on the desk. I immediately sent him to the [principal's] office as we have to take things like this seriously.

(Doc. 20-4, at 1; Doc. 45, at 11.) Class ended approximately two minutes after Plaintiff left for the principal's office and Pelfrey taught his next class "as usual." (Doc. 20-3, at 5; Doc. 45, at 10.)

After reading Pelfrey's email, Nelson met Plaintiff outside the classroom. (Doc. 20-5, at 6.) On the way to her office, Nelson asked Plaintiff, "are you mad?" and "did this really happen?" (*Id.*) Once in her office, she asked Plaintiff again if he was upset, and "did you say you were going to bomb this place" to which Plaintiff replied "no, I said I'm going to bomb you." (*Id.*) Shortly after, the assistant principal, Heath Grider came to Nelson's office. (*Id.*) Nelson and Grider spoke briefly in the conference room and in her deposition, Nelson stated she "thought this was very serious" and that they "needed more guidance." (*Id.* at 7.) The two asked Plaintiff several more times whether he was mad or upset, but Plaintiff "put his head down and was texting" and Nelson felt she "didn't really get more out of him." (*Id.* at 8.)

At that point, she decided to call the school resource officer, Brandon Price ("SRO Price"), for guidance. (*Id.*; Doc. 45, at 16–17.) Nelson testified that she "thought [SRO Price] would contact . . . the Homeland Security office and . . . his direct supervisor," and "that's who she thought needed to give them guidance." (Doc. 20-5, at 8–9; Doc. 45, at 17 (citation modified).) Once in Nelson's office, SRO Price stepped out to call his supervisor and Agent Scott Evans of Tennessee Office of Homeland Security.[6] (Doc. 20-5, at 9.) Nelson separately

---

[6] Prior to this incident, in July or August 2024, Agent Evans was introduced to all the principals in the district at a principals meeting and told the administrators he would provide additional training on mass violence law and threat assessments later in the 2024–2025 school year. (*See* Doc. 20-5, at 3–5.)

called Plaintiff's mother and the superintendent to ask if she needed to refer Plaintiff to the Disciplinary Hearing Authority ("DHA"). (Doc. 20-5, at 10; Doc. 45, at 18–20.) Dr. Mark Griffith, the Director of Marion County Schools, advised Nelson to suspend Plaintiff and refer him to the DHA. (Doc. 29-4, at 5–6; Doc. 45, at 19–20.) Nelson also spoke to Pelfrey about the Plaintiff's statement in class, and she testified that Pelfrey said Plaintiff's statement "made him very nervous" and that Pelfrey believed "it was a very serious . . . statement that [Plaintiff] made." (Doc. 29-4, at 8.)

SRO Price and Nelson then questioned Plaintiff and recorded the conversation on SRO Price's body cam. (Doc. 26, Exhibit 8.) After asking Plaintiff to repeat his statement, SRO Price and Nelson expressed concern that his statement was "a threat of mass violence." (*Id.*) SRO Price asked Plaintiff, "what was your meaning behind 'I'm going to bomb you?'" to which Plaintiff implied he was not serious when he made the statement. (*Id.*) SRO Price responded by saying "the thing is it don't matter if you're being serious" and Nelson told Plaintiff, "you can't say I'm gonna shoot, or I'm gonna kill, or I'm gonna hit, you can't say any of these things anymore." (*Id.*) SRO Price stated, "I don't have no choice about what's got to be done." (*Id.*)

While still recording on his body cam, SRO Price subsequently took Plaintiff to the juvenile justice center and charged him with a threat of mass violence under Tenn. Code Ann. § 39-16-517. (*Id.*; Doc. 55, at 2.) At no point during the body cam footage did SRO Price provide any *Miranda* warnings. (Doc. 26, Exh. 8). That same day, Plaintiff received a three-day "out of school suspension," pending a threat assessment and referral to the DHA. (Doc. 20-5, at 15.) MCSD's verified interrogatory responses state that "[s]chool officials initially suspended [Plaintiff] pursuant to Marion County Board Pol. No. 6.313 for having said that he was 'going to bomb this place,'" and "treated this statement as a bomb threat, a Category IV offense, pending

the outcome of the threat assessment per Tenn. Code Ann. § 49-6-2701 and § 49-6-3401(g)(5)." (Doc. 28-1, at 2.)

#### *ii. The Threat Assessment*

The day after Plaintiff's suspension, SRO Price—under instruction from Agent Evans—collected written statements from three of Plaintiff's classmates who were present during the incident to assess the context of Plaintiff's statement and determine whether Plaintiff was joking. (*See* Doc. 25.) The students' written statements indicate they believed Plaintiff was joking "because he jokes a lot." (Doc. 25.) The classmate who had been tapping the pencil wrote, "I was tapping on [Plaintiff's] desk and [he] said stop before I bomb this place but he was joking." (*Id.* at 2.) SRO Price did not provide these statements to Nelson or the threat assessment team, and Nelson did not see them until her deposition. (Doc. 20-5, at 13.) Nelson also testified that she did not speak to any of the other students to determine whether they believed Plaintiff was joking. (Doc. 45, at 22.) Price testified that he personally knew Plaintiff and his family, that he "did not believe that he was serious," and that he found no bomb paraphernalia or plan. (Doc. 45, at 29–30.)

Two days after Plaintiff's suspension, Nelson—again with guidance from Agent Evans—convened the threat-assessment team, which concluded that Plaintiff was a "Priority 2" non-imminent "threat of violence to others" as reflected in the "Full Threat Assessment Case Worksheet."[7] (Doc. 20-6, at 6.) The threat-assessment team referred Plaintiff to the DHA for a

[7] This worksheet's self-described purpose is "to assist in determining whether the person / situation poses a threat of violence to others, to self, or to both (or poses no threat of violence)." (Doc. 20-6 at 1.) The assessment worksheet also includes a list of the participating parties and instructions on how to assess threats of violence. (*Id.* at 1–6.) Additionally, Nelson notes that Plaintiff's threat assessment was the first one she ever completed. (Doc. 20-5, at 14.)

365-day expulsion for making a bomb threat, pending automatic review by the DHA.[8] (*See* Doc. 20, at 10; Doc. 20-8, at 3; Doc. 29-6, at 1.) Plaintiff remained suspended for a Category IV bomb-threat offense pending his hearing before the DHA. (Doc. 29-4, at 6–15.)

***iii. The DHA hearing***

On August 23, 2024, three days after the incident in English class, the DHA held a hearing to discuss Plaintiff's appeal of the threat assessment determination and his expulsion. (Doc. 29-6, at 1.) During the hearing, the DHA "heard from an assistant principal at Plaintiff's high school, Plaintiff's mother ("Ms. Doe"), Plaintiff's pastor, James Jackson, and Homeland Security Agent Scott Evans, who had interviewed Plaintiff at the South Pittsburgh Police Department." (*Id.* at 1–2; Doc. 40, at 7 (citation modified).) The DHA also considered "paperwork from the school, the report of the threat assessment team, and letters submitted on behalf of Plaintiff's character." (Doc. 29-6 at 2; Doc. 40, at 7.)

The DHA "overturned the Level IV referral" and determined that, while "[Plaintiff] had not made an actual bomb threat," the DHA believed Plaintiff "had made a threat based on the results of the threat assessment team and even the statements of Pastor Jackson who stated that . . . saying 'bomb' means you are about to 'throw hands,' meaning start a fight." (Doc. 26-6, at 2; Doc. 40, at 8.) Accordingly, the DHA found that Plaintiff had "committed a Level III offense, a threat to another student."[9] (Doc. 26-6, at 2; Doc. 40, at 8.) Instead of the 365-day

---

[8] According to the Marion County Board of Education's Student Code of Conduct, a bomb threat is one example of a "zero tolerance" offense that "shall be reported to the director of schools and the Board for expulsion and will also be reported to law enforcement officers." (Doc. 29-6, at 4; Doc. 45, at 41.)

[9] According to the Marion County Board of Education's "Student Code of Conduct," examples of a "Category III Offense" include "Other Types of Threat (Verbal, Written, or Electronic)" and such offenses "are not automatically considered zero tolerance but will be treated as such by the principal unless there are extenuating circumstances." (Doc. 29-6, at 4; Doc. 45, at 41.)

expulsion, the DHA "remanded [Plaintiff] to an alternative school for a semester," and recommended that he meet with the school counselor weekly. (Doc. 26-6, at 2; Doc. 40, at 8.) The chair of the DHA hearing, David Smith, testified that the DHA "overturned the principal's decision" because "we didn't feel that it was a 365-day offense" but imposed the modified punishment because Plaintiff's statement "still fell under the Marion County code of . . . unacceptable conduct." (Doc. 29-5, at 3; Doc. 53, at 28.) Chairman Smith explained that the reasoning behind this was that Plaintiff's statement "was still a threat to a student. It just was not a threat of mass violence." (Doc. 29-5, at 3; Doc. 53, at 28.)

Plaintiff has since completed his semester at the alternative school (*see* Doc. 17, at 16 n.11), and his charge under § 39-16-517 "was ultimately dismissed and expunged." (Doc. 34, at 1–2 n.1; *see also* Doc. 55.)

#### ***iv. Ms. Doe's appeal to the Director of Schools***

On August 29, 2024, Ms. Doe appealed the DHA's decision in writing to Dr. Griffith, enclosing a detailed letter setting out the basis for her disagreement together with several character reference letters. (Doc. 40, at 12–13, 25–26.) On August 30, 2024, Ms. Doe sent an email to Dr. Griffith "resending the previous message of appeal." (*Id.* at 15, 27.) Dr. Griffith responded on September 3, 2024, that he was reviewing the materials and would respond on September 5. (*Id.* at 17, 27.) In a signed declaration, Dr. Griffith declares he "carefully reviewed the entire DHA file, including the audio recording of the hearing," and "spoke with the DHA panel to be sure [he] understood the rationale for their decision." (Doc. 40, at 8.) That same day, rather than appealing to the Board, Ms. Doe asked to meet with Dr. Griffith in the hope that he would reconsider. (Doc. 40, at 8, 18–19.) The two met in person on September 9, 2024. (*Id.*)

In a declaration, Dr. Griffith states that he "gathered from [Ms.] Doe that she thought Juvenile Court might throw the case out" and that he "would contact Juvenile Court . . . and get back with her." (*Id.* at 9.) While he did not reconsider his decision, he further declares that he "did not tell her . . . not to appeal to the Board of Education." (*Id.*) Dr. Griffith did not contact Ms. Doe again, and she did not contact him. (*Id.*) Ms. Doe did not ask him or any Board member to place Plaintiff's appeal on the Board's agenda. (*Id.*) Ms. Doe also contacted a Board member for advice and was told that she "would have to follow the process and that [she would] have the ability to appeal [to] the school board." (*Id.* at 20.) Nevertheless, Ms. Doe did not appeal to the Board because she was waiting to hear back from Dr. Griffith. (*Id.* at 22.)

***v. Training Provided for School Personnel and SROs***

Nelson explains she was "introduced to the [mass violence] legislation . . . when the law was passed" in the summer of 2024 at a yearly summer retreat for administrators. (Doc. 20-5, at 3). During this initial introduction, the superintendent went over "legislative updates and legislative bills that have passed" and informed administrators that a Homeland Security agent would give specific training on the mass violence legislation that had just been passed later in the school year. (*Id.* at 3–5.) Before the incident with Plaintiff, Nelson was tasked with assembling a threat-assessment team. (*Id.* at 5.) By August 20, 2024, Nelson had assembled the threat-assessment team, which included herself, Grider, SRO Price, a junior-high teacher, and the school's counselor. (*Id.* at 5, 15.) However, no one on this threat-assessment team received specific training on the amended mass-violence law until later in the school year, after the underlying incident and the completion of Plaintiff's threat assessment. (*Id.* at 3.) Nelson notes that, based on her knowledge today, the distinction between when a student's statement should be referred to law enforcement versus a threat assessment team first "depend[s] on the

context . . . how [the statement] was presented. . . . if the student was playing around or joking . . . [or] if the student seemed mad or angry or upset."[10] (*Id.* at 21.)

According to Marion County, SROs complete mandatory training "annually to maintain their employment as SROs." (Doc. 31, at 13.) According to SRO Price, SROs receive 16 hours of annual training on their unique responsibilities as SROs, in addition to the mandated 40 hours of training for all deputies in the state. (*See* Doc. 20-7, at 3–4.) In 2024, the district attorney general's office conducted a training on "the new law regarding threats of mass violence." (Doc. 31, at 13.) Additionally, in 2025, the SRO training specifically covered training on threat assessments. (*Id.*) Agent Evans also trained Chairman Smith "to understand the requirements of Tennessee's law governing threats of mass violence" including "that the use of the word 'bomb' did not automatically mean [Plaintiff] was guilty of [a threat of mass violence]." (Doc. 29-6, at 2.)

Finally, at the time of the incident with Plaintiff, SROs—including SRO Price—received a Memorandum of Understanding that "outlin[es] the scope of work of School Resource Officers" and calls for collaborative "[p]lanning and training for emergencies and school safety" as well as an "open exchange of information" that complies with "sheriff's department rules, the school district policies, and all applicable laws, especially [the Family Educational Rights and Privacy Act]." (Doc. 20, at 16.)

---

[10] Nelson also notes that in the context of the statement conveyed to her by Pelfrey she believed it was a serious statement made by someone who was frustrated or irritated. (Doc. 20-5, at 21). When asked whether it would make any difference to her if Plaintiff had said "I'm going to bomb this place" or "I'm going to punch you in the face" Nelson says that "both are a threat. . . . [b]ut bomb this place would, would indicate that other kids would get hurt—you know, lots of people or several people could get hurt." (*Id.* at 22). She further notes that she would take both statements seriously. (*Id.*)

### D. Procedural History

On October 31, 2024, Plaintiff, a minor proceeding through his parent and guardian, Mary Doe, initiated this action against Defendants Marion County and MCSD. (Doc. 1.) In his amended complaint, Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments. (*See* Doc. 17, at 17–18.) Specifically, Plaintiff claims that his use of the word "bomb" was protected speech and that Defendants took adverse action against him for the use of that speech as a result of both an unconstitutional official policy and practice of disciplining students for the use of non-serious words, as well as from Defendants' failure to train school officials and school resource officers. (*See* Doc. 17, at 16–18.) As to the Fourteenth Amendment, Plaintiff claims Defendant MCSD denied him his procedural due process rights by not hearing his appeal (*see id.* at 18–19), and that he was denied substantive due process because his removal from school for a word "[n]o one believed . . . [was] truly threatening" bore no rational relationship to any legitimate state interest (*see id.* at 19). Plaintiff seeks: (1) declaratory relief, (2) injunctive relief to "remedy the penalty of the alternative school discipline . . . and training for school officials on handling" the "true threat doctrine," (3) compensatory damages, (4) nominal damages, and (5) attorney's fees. (*See id.* at 19–20.)

Plaintiff moved for a preliminary injunction (Doc. 19) on July 17, 2025. In his preliminary injunction motion, Plaintiff requested that the Court provide the following injunctive relief: (1) order MCSD to "develop and implement" training policies compliant with Tenn. Code Ann. § 49-6-2701; (2) order the County Sheriff's Office to train SROs on "the statutory requirements for school-based threat assessments, including the limits on disclosure under FERPA and § 49-6-2701"; (3) enjoin the County's Sheriff's Office from allowing SROs to participate in threat assessments unless they are "trained accordingly"; (4) prohibit Defendants

from further disciplining Plaintiff based solely on his speech; and (5) grant any other relief "the Court deems just and proper." (*Id.* at 1–2).

The Court denied Plaintiff's motion on October 24, 2025. (*See* Doc. 35.) Because the Plaintiff's requested relief turned on his failure-to-train theory, the Court, assuming without deciding whether a constitutional violation had occurred, analyzed only whether Plaintiff had made a clear showing of a likelihood to succeed on his municipal-liability claim. (*Id.* at 11.) The Court concluded that Plaintiff had not shown a likelihood of success on the merits for either inadequate training or deliberate indifference (*see id.* at 10–16) and that he had not demonstrated he was likely to suffer irreparable harm (*see id.* at 17–19). The Court did not reach Plaintiff's due process claims because they were not raised as a basis for the requested injunctive relief. (*See id.* at 11, n.8.) The Court also declined MCSD's request to consolidate the briefing with a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), observing that, "while the Court finds the Plaintiff has not met his burden for granting a preliminary injunction, Plaintiff still may be successful on the merits at trial." (*Id.* at 20.)

Following close of discovery, MCSD moved for summary judgment on all of Plaintiff's claims. (Doc. 43) Marion County separately moved for summary judgment. (Doc. 41.) Plaintiff filed cross-motions for partial summary judgment against Marion County (Doc. 46) and MCSD (Doc. 48). As to MCSD, Plaintiff moves only on his First Amendment claim and corresponding official-policy theory of municipal liability. (*See* Doc. 48, at 1.) He has not moved for summary judgment on his alternative *Monell* theory of failure-to-train or on either of his substantive or procedural due process claims. (*See id.*)

On June 28, 2026, Plaintiff filed a joint notice advising the Court that Plaintiff and Marion County had resolved all issues between them and would file a stipulation of dismissal

with prejudice. (Doc. 63, at 1.) The notice states that "Plaintiff's complaint and the claims by Plaintiff against Defendant [MCSD] remain." (*Id.*) MCSD's and Plaintiff's cross-motions for summary judgment are now ripe for review.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy,*

*Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

MCSD contends that it is entitled to summary judgment because: (1) Plaintiff's speech was not protected speech, (2) its officials were properly trained and acted pursuant to constitutionally sound polices, (3) Plaintiff received sufficient process, (4) Plaintiff did not exhaust his remedies by failing to appeal to the Board directly, and (5) the discipline MCSD ultimately imposed was rationally related to the legitimate state interest of maintaining safety and order at school. (*See generally* Docs. 43, 44.) In contrast, Plaintiff contends that he is entitled to partial summary judgment on his First Amendment and corresponding *Monell* claim under § 1983 because MCSD's alleged policy and practice of removing students for "non-serious speech" is unconstitutional.[11] (*See* Doc. 48, at 1.)

### A. Threshold Issues

#### *i. The Court's Preliminary Injunction Ruling Does Not Control*

First, MCSD contends that Plaintiff's motion for partial summary judgment "merely repeat[s] unsuccessful arguments offered" in support of Plaintiff's motion for partial summary judgment. (Doc. 52, at 1.) Therefore, MCSD believes the Court should deny Plaintiff's motion for partial summary judgment "just as the Court denied Plaintiff's earlier Motion." (*Id.*) However, a ruling denying preliminary injunctive relief does not have a preclusive effect on a Court's later determination on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted) (noting that "findings of fact and conclusions of law made by a court

[11] Plaintiff notes that he is not moving for summary judgment on his failure-to-train *Monell* claim or his procedural or substantive due process claims. (Doc. 48, at 1.)

granting preliminary injunction are not binding at trial on the merits"); *see also Radiant Glob. Logistics, Inc. v. Furstenau*, 951 F.3d 393, 397 (6th Cir. 2020) (citations omitted) ("[A] preliminary injunction has no preclusive effect . . . on the judge's decision whether to issue a permanent injunction.").

### *ii. Scope of the Claims and Theories at Issue*

Plaintiff and Marion County have resolved all issues between them. (*See* Doc. 63.) What remains before the Court concerns the discipline MCSD imposed. Issues regarding Plaintiff's arrest, the alleged failure to provide *Miranda* warnings, and the SRO's conduct have been resolved. (*Id.*) To the extent that Plaintiff's amended complaint discusses alleged violations of the Family Educational Rights and Privacy Act ("FERPA"), that theory affords no independent avenue for relief as FERPA "create[s] no rights enforceable under § 1983" and therefore will be dismissed. (*See* Doc. 35, at 11 n.8 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).) Finally, because Plaintiff explicitly limits his partial motion for summary judgment to his First Amendment claim and the associated official-policy theory of municipal liability (*see* Doc. 48, at 1), the Court considers those theories only in connection with MCSD's motion.

Plaintiff brings his First and Fourteenth Amendment claims under 42 U.S.C. § 1983 which provides in relevant part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

### B. First Amendment Retaliation Claim

Plaintiff argues that MCSD violated his First Amendment rights to free speech when school officials punished him for his statement, "I'm going to bomb you" without considering his intent or whether his words constituted a "true threat." (*See generally* Docs. 17, 48, 49).

MCSD, however, contends it punished Plaintiff not for using the word "bomb," but rather for making a threat to fight another student because that threat caused a disruption to his class and violated the Student Code of Conduct. (*See* Doc. 44, at 7–8.)

The First Amendment, as incorporated against the States by the Fourteenth Amendment, prohibits state actors from "abridging the freedom of speech[.]" *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 743 (6th Cir. 2025) (en banc) (quoting U.S. Const. amend. I)). The Supreme Court has held that First Amendment free speech protections apply to both students and teachers when "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (citation omitted). However, "[t]he First Amendment rights of students are also limited." *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007). The Sixth Circuit has consistently recognized that "local school officials are best situated to determine what is appropriate for children in school, and constitutional claims have consistently been given a less rigorous review in school settings." *Curry ex rel Curry v. Hensiner*, 513 F.3d 570, 578 (citing *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005). This is because educators act "*in loco parentis*" when supervising children during the school day. *Olentangy*, 158 F.4th at 745 (citing *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986)).

In the school context, the Supreme Court has adopted different standards of review based on the speech at issue. *See Olentangy*, 158 F.4th at 746 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)). In the Sixth Circuit's recent en banc decision in *Olentangy*, the court synthesized various categories of student speech a school may restrict, including: curricular speech reasonably related to legitimate pedagogical concerns, *Hazelwood Sch. Dist. v. Kuhlmeir*, 484 U.S. 260 (1988); lewd or vulgar speech, *Fraser*, 478 U.S. (1986);

speech reasonably construed as promoting illegal drug use, *Morse v. Frederick*, 551 U.S. (2007); and personal non-curricular student expression, *Tinker*, 393 U.S. (1969). *See* 158 F.4th at 745–47. Here, the category at issue—Plaintiff's use of the word "bomb" in class directed toward another student—falls under *Tinker* and its exceptions as non-curricular student expression.[12]

Under *Tinker* and its progeny, school officials may regulate student speech that "materially and substantially" interferes with school operations or the rights of other students. *Lowery*, 497 F.3d at 588 (citing *Tinker*, 393 U.S. at 509). School officials do not have to wait for a disruption to occur before they can limit student speech or expression; rather they may act on "common-sense conclusions" to reasonably forecast whether the speech "would clearly negatively affect the school's overall ability to maintain order and discipline." *Lowery*, 497 F.3d at 594. Importantly, this analysis is not "a uniform, one size fits all approach." *Olentangy*, 158 F.4th at 753 (citation omitted) (citation modified). To determine whether speech is unprotected, courts should consider "the content and context of the speech at issue." *Olentangy*, 158 F.4th at 753 (citing *Lowery*, 497 F.3d at 588). The ultimate inquiry turns on the objective reasonableness

[12] Plaintiff argues this Court should depart from *Tinker* altogether and apply instead the subjective-recklessness standard that the Supreme Court articulated in *Counterman v. Colorado*, 600 U.S. 66 (2023). (*See* Doc. 57, at 7 (arguing "*Tinker* and *Counterman's* true threats doctrine are independent and distinct First Amendment exceptions").) *Counterman* addresses a form of unprotected speech, "true threats," that are prosecuted criminally. *See generally id.* Because he was disciplined for threatening another student, Plaintiff argues that MCSD may not treat his speech as unprotected unless MCSD can show he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." (Doc. 57, at 5–7 (citing *Counterman*, 600 U.S. at 69, 79).) The Court rejects Plaintiff's view, as the Sixth Circuit's *Olentangy* decision explicitly recognizes *Counterman's* "true threats" doctrine as a form of personal, non-curricular student expression that would fall under *Tinker* and its exceptions. *See Olentangy*, 158 F4th at 749–50 (citing *Counterman*, 600 U.S. at 74) (noting that schools "likely have greater authority to regulate threatening speech than the Court's true-threats [*Counterman* test] would permit for adults").) *Counterman* is one aspect of *Tinker's* analysis but does not displace *Tinker* as the standard for assessing whether Plaintiff's speech was protected in the school context.

of the school administrator's response, not on the subjective intentions of the student who spoke. *See Lowery v. Euverard*, 497 F.3d at 592 (citation omitted) (explaining *Tinker* requires "only that the [school officials'] forecast of disruption be reasonable").

A school bears the burden of proof when arguing that it lawfully restricted speech under *Tinker*; however, the standard of proof "changes based on the speech." *Olentangy*, 158 F.4th at 750–51. The Sixth Circuit explained that, within *Tinker's* reasonable-forecast standard, "the closer the speech resembles the fighting words, true threats, defamation, and other statements that fall outside the First Amendment, the less evidence a school must present to show that the speech will likely cause a substantial disruption." *Id.* at 751. In contrast, the more the speech resembles political expression, particularly where a policy discriminates based on viewpoint, the more the school's burden of proof rises. *Id.* at 751.

Here, Plaintiff's statement was not political expression, and MCSD's policy involves no viewpoint discrimination of the kind at issue in *Olentangy.* Consequently, MCSD's burden of proof is reduced, not raised, as the speech at issue resembles fighting words or a true threat. *See Olentangy*, 158 F.4th at 751 (citing *Kutchinski*, 69 F.4th at 359–60 (finding minimal evidence required to establish a school reasonably forecasted disruption from a social-media account impersonating a teacher and directing "sexual and violent posts" at the school community)); *see also Lowery*, 497 F.3d at 594. Additionally, other circuits applying these principles have afforded school administrators wide latitude to discipline students for statements referencing school violence, even when the student later characterizes the statement as fiction, hyperbole, or a joke. *See, e.g.*, *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984–85 (11th Cir. 2007); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001).

Even viewed in the light most favorable to Plaintiff, no reasonable jury could find that MCSD violated Plaintiff's First Amendment rights. The record shows there were two distinct disciplinary actions taken, each being independently justified: (1) Plaintiff's initial suspension pending a threat assessment, based on Pelfrey and Nelson's referrals; and (2) the discipline MCSD ultimately imposed based on the DHA's determination that Plaintiff threatened a fellow student. Plaintiff's evidence that no one believed he intended to detonate a literal bomb does not create a genuine dispute of fact as to either.

First, Plaintiff's initial suspension pending the threat assessment and DHA hearing was based on a reasonably forecasted disruption to school operations and was statutorily authorized. Tennessee law explicitly provides that following a possible threat of mass violence, a student "may be suspended from attendance at the school . . . until the threat assessment is complete. Tenn. Code Ann. § 49-6-3401(g)(5). School officials provisionally suspended Plaintiff to conduct such a threat assessment and to refer him to the DHA.[13] (Doc. 20-5, at 15.) Here, the school administrators made this three-day provisional suspension based on their objectively reasonable response to Plaintiff's words, following Pelfrey's determination that Plaintiff had threatened another student in a serious attempt to make another student stop tapping his pencil. *See Tinker*, 393 U.S. at 514.

Pelfrey testified that Plaintiff's statement was made "in an irritated and loud tone," that Plaintiff struck his hands on the desk and appeared to be coming out of his chair, and that as a result of Plaintiff's words, "[t]he entire class became quiet." (Doc. 20-3, at 10–11; Doc. 29-3, at

---

[13] Throughout his brief, Plaintiff refers to this provisional suspension as an "expulsion." (*See, e.g.*, Doc. 58, at 3.) However, under Tennessee Code § 49-6-341(g)(5), temporary removal from school until a threat assessment is completed is considered a suspension, which is consistent with how Nelson and Board Policy 6.317 categorize removal from school while a zero-tolerance offense is being investigated. (*See* Doc. 50-5, at 15–16; Doc. 45, at 46–47.)

1.) Plaintiff testified that he raised his voice loudly enough for the "whole class" to hear him and "in a tone to indicate [he was] serious." (Doc. 20-2, at 19; *see also* Doc. 45, at 7; Doc. 53, at 13–16.) A classmate near him said, "you can't say that," and Plaintiff testified he understood at once that he had made a big mistake. (Doc. 53, at 15–16.) Pelfrey testifies that he would have referred Plaintiff to the principal's office regardless of whether Plaintiff had said "bomb you" or "bomb this place," explaining that his focus was on "the disruption [Plaintiff] caused" to his class. (Doc. 29-7, at 2–3.)

That Pelfrey believed an actual bomb threat was "highly unlikely" (Doc. 20-3, at 10), and that he resumed teaching shortly after sending Plaintiff to Nelson's office unescorted does not undermine MCSD's argument. Here, the record demonstrates that while Pelfrey did not believe Plaintiff immediately intended to detonate an explosive, he recognized that a loud, aggressive, violence-invoking statement directed at a classmate warranted immediate action and further investigation. (*Id.*; *see also* Doc. 20-2, at 19.) *Tinker* allows school officials to exercise in-the-moment judgment; it does not require a school official to determine, in real time, whether a statement invoking violence is meant literally before responding to the disruption it has already caused. *See Lowery*, 497 F.3d at 591–92 (citation omitted) ("*Tinker* does not require school officials to wait until the horse has left the barn before closing the door."). Moreover, MCSD's burden to justify this initial provisional response was reduced by the statement's resemblance to fighting words or a true threat. *See Olentangy*, 158 F.4th at 749 (citation omitted) ("[S]chools likely have greater authority to regulate threatening speech than the Court's true-threats test would permit for adults."); *see also Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984–85 (11th Cir. 2007); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001).

Nelson's decision to provisionally suspend Plaintiff until the DHA hearing was also grounded in "common-sense conclusions based on human experience." *Lowery*, 497 F.3d at 594. Nelson did not act on Pelfrey's email in isolation; she spoke with Pelfrey directly about what occurred in her classroom. (*See* Doc. 29-4, at 8.) Nelson testified that Pelfrey told her Plaintiff's statement "made him very nervous" and that he believed "it was a very serious statement . . . [Plaintiff] had made." (*Id.*) Nelson's and SRO Price's statements that Plaintiff's subjective seriousness "d[id]n't matter," at most reflect a mistaken view of how the criminal mass-violence statute operated. (Doc. 26, Exhibit 8). They do not undermine the objective reasonableness of suspending Plaintiff pending an investigation and referral to the DHA that the statute itself required. *See* Tenn. Code Ann. § 49-6-3401(g).

Second, MCSD contends that it ultimately disciplined Plaintiff based on a finding that he threatened to fight another student, and Plaintiff puts forward no evidence to rebut that contention. (Doc. 44, at 7–9.) The threat-assessment team concluded Plaintiff had not made a threat of mass violence but still found that he posed a non-imminent "threat of violence to others." (Doc. 20-6, at 6.) Following a full hearing, the DHA "overturned the Level IV referral," expressly finding Plaintiff "had not made an actual bomb threat" and "did not intend to blow up the school or any student." (Doc. 29-6, at 2; Doc. 40, at 8.) Instead, the DHA found that Plaintiff had threatened another student and based their determination in part on Plaintiff's own character witness, Pastor Jackson, who told the DHA during the hearing that saying "bomb" means one is "about to 'throw hands,'" meaning to start a fight. (Doc. 29-6, at 2; Doc. 40, at 8; Doc. 49-1, at 2.) While Plaintiff argues that Chairman Smith discussed Plaintiff's use of the word "bomb" during the hearing (*see* Doc. 57, at 10), he offers no explanation for Pastor Jackson's statement, or any evidence demonstrating that the DHA's reliance on Pastor Jackson's

statement was pretextual. Consequently, Plaintiff fails to raise a genuine dispute of material fact that the DHA punished Plaintiff solely for using the word "bomb," and MCSD has shown there is no genuine dispute of material fact that it punished Plaintiff to prevent a material and substantial disruption. As such, MCSD's motion for summary judgment is **GRANTED** and Plaintiff's motion for partial summary judgment on that same claim is **DENIED**.

### C. Municipal Liability under *Monell*

Plaintiff advances two theories of municipal liability under 42 U.S.C. § 1983 against MCSD: first, that Board Policy 6.313 is a facially unconstitutional policy that was the "moving force" behind his discipline (*see* Doc. 51, at 9–11); and in the alternative, that MCSD failed to train its personnel on the threat-of-mass-violence statute and related threat-assessment procedures. (Doc. 17, at 16–18.) MCSD moves for summary judgment on both theories of liability, and Plaintiff moves for summary judgment solely on his official-policy theory. (Doc. 43, at 1; Doc. 48, at 1.)

To succeed on a § 1983 municipal-liability claim, a plaintiff must show both: (1) that he suffered a constitutional injury; and (2) that the alleged violation was caused by the municipality's policy or custom. *See Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Here, Plaintiff also brings a First Amendment claim under § 1983. Consequently, both of Plaintiff's municipal liability claims require, as a threshold issue, that MSCD's discipline of Plaintiff violated the First Amendment. *See Novak*, 33 F.4th at 309. As explained *supra* Part III.B, Plaintiff has failed to establish a genuine dispute of material fact that MCSD violated his First Amendment right to free speech. Consequently, Plaintiff's § 1983 claims fail regardless of whether Policy 6.313 was inadequately drafted or whether MCSD's threat-assessment training was deficient. Therefore,

MCSD's motion for summary judgment is **GRANTED** as to Plaintiff's municipal liability claims, and Plaintiff's motion for summary judgment on his official-policy theory of municipal liability is **DENIED**.

### D. Fourteenth Amendment Claims

The Fourteenth Amendment guarantees "that one may not be deprived of life, liberty, or property without due process of law." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000). What constitutes property for due process purposes is determined by state law. *See id.* Under Tennessee state law, students have a property interest, protected by due process in a public high school education. *See id.* at 574. Due process has two components: (1) procedural due process, "often summarized as 'notice and an opportunity to be heard;'" and (2) substantive due process. *See id.* at 574–75. Plaintiff brings both procedural and substantive due process claims against MCSD through § 1983. (*See* Doc. 17, at 18–19.)

#### ***i. Procedural Due Process***

MCSD argues it is entitled to summary judgment on Plaintiff's procedural due process claims, because Plaintiff received considerably more process than required, and in any event, failed to exhaust the process Tennessee law and Board policy made available to him. (Doc. 44, at 9–13.)

"Public-school students facing expulsion or suspension are entitled to due-process protection." *Reedy ex rel. D.R. v. Huron Sch. Dist.*, No. 25-1234, 2026 WL 483187, at *3 (6th Cir. Feb. 20, 2026) (citing *Halasz v. Cass City Pub. Schs.*, 162 F.4th 724, 735 (6th Cir. 2025)). This includes temporary suspensions for ten days or less. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975). At minimum, adequate process requires "oral or written notice of the charges against the student, an explanation of the evidence the authorities had, and an opportunity to present his side

of the story." *Reedy*, 2026 WL 483187, at *3 (citing *Goss*, 419 U.S. at 581; *Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988)). In the case of temporary suspensions for ten days or less, "there need be no delay between the time notice is given and the time of the hearing." *Goss*, 419 U.S. at 582 (citation omitted) (citation modified). For temporary suspensions, informal hearings where the student is "told what he is accused of doing" and "what the basis of the accusation is" is generally sufficient as long as the student receives the opportunity to explain his version of the facts.[14] *Id.*

However, for longer suspensions or expulsions, more formal procedures may be needed. *Id.*; *but see Newsome*, 842 F.2d at 928 (citation omitted) ("While *Goss* specifically limited itself to the short suspension . . . it nevertheless establishes the *minimum* requirements for long-term expulsions as well.") Here, Tennessee law provides the procedure required for suspensions or expulsions exceeding ten days. *See* Tenn. Code Ann. § 49-6-3401(c)(4) (permitting a student to first appeal to the board of education or DHA). Local rules also provide additional procedures for discipline exceeding ten days. Board Policy 6.317 requires referral to the DHA for every suspension exceeding ten days, not just the decisions students choose to appeal. (*See* Doc. 45, at 46.) Following a DHA decision, students can appeal to Dr. Griffith directly, and if unsatisfied with his determination, they can appeal to the Board of Education within five days. (*See* Doc. 40, at 11.)

There is no genuine dispute of material fact that Plaintiff received the process he was due, both for his temporary suspension and for his remand to the alternate school. The record shows

[14] Despite this general rule, "there are recurring situations in which prior notice and a hearing cannot be insisted upon" such as situations where a student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process[.]" *Goss*, 419 U.S. at 582.

that when Nelson first suspected Plaintiff had made a threat of mass violence, she and SRO Price told Plaintiff what he was accused of doing and gave him the opportunity to explain his side of the story. (*See* Doc. 20-5, at 6; Doc. 26, Exhibit 8.) Nelson also contacted Plaintiff's mother and informed her of the charges. (Doc. 20-5, at 10.) Plaintiff presents no evidence to suggest that Plaintiff was not aware of the charges against him at the time he was initially suspended, and no delay was required between the time Plaintiff received notice and the informal hearing with Nelson and SRO Price. *See Goss*, 419 U.S. at 582.

Moreover, Plaintiff fails to demonstrate a genuine dispute of material fact that the process for his remand to the alternative school was inadequate. Following Plaintiff's initial suspension, Nelson conducted a threat assessment, and the threat assessment team determined that Plaintiff did not make a threat of mass violence. (Doc. 20-6, at 5–6.) Nelson also contacted Dr. Griffith, who directed her to refer Plaintiff to the DHA for a hearing at the time of his initial suspension. (Doc. 29-4, at 5–6.) The DHA then convened a hearing, where it heard from Plaintiff, Ms. Doe, and Plaintiff's pastor. (Doc. 29-6, at 1–2; Doc. 40, at 8.) The DHA also considered the threat assessment itself, statements made by Agent Evans, and letters submitted on Plaintiff's behalf. (Doc. 29-6, at 1; Doc. 40, at 7.) Rather than affirm the referral, the DHA credited explanations offered on Plaintiff's behalf, overturned the Category IV 365-day expulsion, and sustained a lesser Category III finding, remanding Plaintiff to an alternative school for the remainder of the semester. (Doc. 29-6, at 2; Doc. 40, at 8.) Taken together, these events satisfy the minimum requirements for due process as well as the more formal procedures contemplated by *Goss* and Tennessee law. *See* 419 U.S. at 582; Tenn. Code Ann. § 49-6-3401(c)(4). The fact that the DHA ultimately declined to accept Plaintiff's position in full does not mean that the process leading to that finding was constitutionally deficient. *See Seal*, 229 F.3d at 574 (noting that

complaints about the outcome of a process are a substantive, rather than procedural, due process challenge).

Moreover, Plaintiff also received additional process. Dr. Griffith heard a further appeal from Ms. Doe who submitted a letter and character references on Plaintiff's behalf. (Doc. 40, at 8, 25–26.) Dr. Griffith declares that he "carefully reviewed the entire DHA file, including the audio recording of the hearing," and "spoke with the DHA panel to be sure [he] understood the rationale for their decision," before responding to Ms. Doe on September 5, 2024, telling her he was upholding the DHA's decision. (Doc. 40, at 8, 28.) Plaintiff does not contest that he received an investigation, an evidentiary hearing, and a further written appeal reviewed on the merits, which together exceed the "minimum notice and hearing requirements under *Goss*." *See Reedy*, 2026 WL 483187, at *3 (citing *Goss*, 419 U.S. at 581).

Finally, even if there was some procedural deficiency, Plaintiff failed to exhaust the process provided by Tennessee law and Board policy. Where, as here, the DHA hears the matter first, Board Policy 6.317 permits a student to appeal the DHA's decision to the Director of Schools. (Doc. 40, at 11; Doc. 45, at 47.) Additionally, within five days of the Director's decision, the student may request the Board of Education review the record. (Doc. 40, at 11; Doc. 45, at 47.) However, the decision to review the Director's decision is discretionary. (Doc. 40, at 11; Doc. 45, at 47.) Following Dr. Griffith's written notice that he was upholding the DHA's decision, Ms. Doe sought reconsideration from Dr. Griffith rather than appeal to the Board of Education. (Doc. 40, at 8, 18–19.) Despite expressing some confusion about Dr. Griffith not getting back to her, Ms. Doe testified that she was aware that appealing to the Board

was the next available step.[15] (Doc. 40, at 20.) Dr. Griffith also declares that he never told Ms. Doe not to appeal to the Board, and Plaintiff provides no evidence to the contrary. (Doc. 40, at 9.) Consequently, MCSD has demonstrated there is no genuine dispute of material fact as to Plaintiff's procedural due process claim and their motion for summary judgment on this issue is **GRANTED**.[16]

***ii. Substantive Due Process***

Plaintiff also brings a claim against MCSD for substantive due process violations. (Doc. 17, at 19.) MCSD argues that it is entitled to summary judgment on this claim because its decision to suspend Plaintiff and remand him to an alternative school was rationally related to a legitimate government interest. (*See* Doc. 44, at 13.)

Substantive due process prevents the government from taking certain actions "regardless of the fairness of the procedure used to implement them." *Halasz*, 162 F.4th at 736. Government actions that burden the exercise of fundamental rights are subject to strict scrutiny, while government actions that do not interfere with fundamental rights or involve suspect classifications "will be upheld if they are rationally related to a legitimate state interest." *Seal*, 229 F.3d at 575. The Supreme Court has held that attending public school is not a fundamental

[15] Even if Dr. Griffith should have followed up with Ms. Doe after their September 9 meeting, Plaintiff does not raise a municipal-liability issue for violations under § 1983 because Plaintiff has not pointed out a policy or practice of disregarding Board No. 6.317. *See Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

[16] Plaintiff does not address MCSD's failure-to-exhaust argument, instead arguing that Plaintiff did not have notice of the Category III threat. (*See* Doc. 57, at 14.) However, the record suggests Plaintiff knew he was suspended for a threat of mass violence until the DHA hearing could evaluate Nelson's referral. (*See* Doc. 20-5, at 14; Doc. 26, Exhibit 11.) Plaintiff's complaint about receiving a lower Category III charge for threatening another student, following the DHA's review goes to complaints about the outcome of the hearing, which is a substantive, rather than procedural issue. *See Seal*, 229 F.3d at 574.

right for the purposes of substantive due process. *Id.* (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–37 (1973)).

Substantive due process claims generally require that a plaintiff show: "(1) they were deprived of a constitutionally protected interest, and (2) 'the government's discretionary conduct that deprived the interest was constitutionally repugnant.'" *Halasz*, 162 F.4th at 736 (citation omitted); *see also Newcomb ex rel. B.N. v. Williamson Cnty. Bd. of Educ.*, No. 3:24-CV-00631, 2026 WL 1405615 (M.D. Tenn. May 19, 2026) (citing *Halasz*, 162 F.4th at 736–37 (explaining courts have found substantive due process violations where the government action was "willful and unreasoning," "shock[ed] the conscience," was "extremely irrational" or "lack[ed] some factual basis")). According to the Sixth Circuit, substantive due process claims in the school discipline context "will succeed only in the 'rare case' when there is 'no rational relationship between the punishment and the offense.'" *Seal*, 229 F.3d at 575. Rational-basis review "is a paradigm of judicial restraint," and a plaintiff bears the burden of "negativ[ing] every conceivable basis which might support" the government's action. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993).

Here, Plaintiff argues that: (1) if Plaintiff's speech is constitutionally protected then any punishment for that speech is by definition irrational; and (2) even if we accept MCSD's characterization of Plaintiff's words being a "fighting threat" rather than a threat of mass violence, "the punishment imposed bears no rational relationship to how the Code of Conduct treats that offense" because fighting is a Category II offense and carries a graduated schedule, with first-time offenses resulting in a five-day suspension. (Doc. 57, at 12; *see also* Doc. 40, at 40–41.) Plaintiff's first argument is not a substantive due process claim, but rather Plaintiff's First Amendment claim restated in a different way. The Court has already determined that

Plaintiff failed to demonstrate a genuine dispute of material fact as to his First Amendment claim (*see supra* Part III.B) and will not reconsider that argument here.

As to Plaintiff's second argument, Plaintiff specifically contends that he was irrationally and excessively punished because a first-offense fighting threat (which is listed as a Category II offense in the Student Code of Conduct) carries a maximum suspension of five days, but Plaintiff was remanded to an alternative school for a first-time offense. (*See* Doc. 57, at 10, 12.) However, the DHA did not sustain a Category II finding for *fighting* but rather, found that Plaintiff had "committed a Level III offense, a *threat* to another student." (Doc. 29-6, at 2; Doc. 40, at 8 (emphasis added).) Plaintiff's argument therefore misreads the code. Category III offenses, which include "other types of threat (verbal, written or electronic)," carry no penalty cap and are "treated as [zero tolerance] by the principal unless there are extenuating circumstances. (Doc. 45, at 41 (citation modified).) Accordingly, Plaintiff's five-day ceiling does not apply to the offense the DHA found he committed. (*See* Doc. 29-6, at 2.)

To the extent that Plaintiff argues it is irrational to enforce a lesser punishment for fighting compared to threatening to fight (*see* Doc. 57, at 12), this argument fails to raise a genuine dispute of material fact demonstrating the Student Code of Conduct is arbitrary. *See Halasz*, 162 F.4th at 737 ("A decision is arbitrary if it lacks any rational basis"). MCSD has explained the Student Code of Conduct "rationally draws a distinction between two students fighting, which is a Level II offense, and one student threatening another, which is a Level III offense" because fighting requires both parties to be willing combatants. (Doc. 60, at 4.) Here, the Code's decision to treat a threat toward a specific classmate more seriously than a fight is a rational line for the school board to draw, and it is not the role of a federal court to second-guess it. *See Kutchinski*, 69 F.4th at 360–61 ("[S]chool officials need a degree of flexible authority to

respond to disciplinary challenges."); *see also Newcomb*, 2026 WL 1405615, at *9 (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975) *abrogated on other grounds*) ("As the Supreme Court has stated, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.")); *Beach Commc'ns, Inc.*, 508 U.S. at 314–15.

Finally, the Sixth Circuit has found that that significant punishments for threats of violence do not "shock the conscience" and are not "extremely irrational" even if the threat turned out to be unsubstantiated or the student did pose an immediate danger to other students. *See Halasz*, 162 F.4th at 737. Consequently, Plaintiff has failed to demonstrate a genuine dispute of material fact as to his substantive due process claim, and MCSD's motion for summary judgment as to that claim is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above,

1. Defendant Marion County School District's motion for summary judgment (Doc. 43) is **GRANTED**.

2. Plaintiff's motion for partial summary judgment against Marion County School District (Doc. 48) is **DENIED**.

3. Marion County's motion for summary judgment (Doc. 41) and Plaintiff's motion for partial summary judgment against Marion County (Doc. 46) are **DENIED** as moot.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

***/s/ Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**